672 So.2d 1246 (1996)
C.W. TAYLOR
v.
STATE of Mississippi.
No. 90-DP-01346-SCT.
Supreme Court of Mississippi.
April 25, 1996.
*1252 Jim Kitchens, Kitchens & Ellis, Jackson, Connie Johnson, Houma, LA; John Holdridge, New Orleans, LA, for appellant.
Michael C. Moore, Attorney General, Marvin L. White, Jr., Assistant Attorney General, Charlene R. Pierce, Sp. Asst. Attorney General, Jackson, for appellee.
En Banc.

ON PETITION FOR REHEARING
PITTMAN, Justice, for the Court:
Petitions for Rehearing denied. The original opinions are withdrawn and these opinions are substituted therefor.
This appeal comes from the First Judicial District of the Circuit Court of Hinds County, Mississippi. C.W. Taylor (hereafter referred to as "Taylor") was indicted and reindicted three times, the last being for the crime of capital murder while under a life sentence, in violation of Miss. Code Ann. § 97-3-19(2)(b) (1972). This final indictment also charged Taylor as an habitual offender pursuant to Miss. Code Ann. § 99-19-81 (1972). After several substitutions of defense counsel, an interim conviction for aggravated assault, and a change of venue to Hancock County, Mississippi, Taylor was found guilty of capital murder and sentenced to death.

THE FACTS
The facts of the case were adduced at trial solely through the evidence offered by the State. The defendant neither took the stand nor offered any evidence in the guilt phase of the trial.

*1253 The Disappearance

On the morning of Saturday, July 11, 1987, twenty-two year old Mildred Spires worked at her job at a grocery across town from her home. In the early afternoon, she returned to the home she shared with her mother, Edith Taylor, and her 17 year old sister, Melissa Spires.
Between 4:00 p.m. and 5:00 p.m., Mildred received a telephone call from Taylor, her mother's estranged husband, and they had a discussion about a "pipe," a car part. She was heard to ask him how she would know how the pipe looked and where it would be in the back part of the garage, where he kept tools and parts. After the phone call, Mildred announced to Melissa that she was going to get gas for her car. Melissa gave her money and asked Mildred to bring back some Doritos Ranch chips.
Mildred left the house wearing Calvin Klein jeans, a t-shirt with the word "physical" printed on the front of it in red, white sandals, a gold chain and a watch. After Mildred had walked out of the house, Taylor telephoned and asked Melissa if Mildred had left yet.
Before Mildred drove off in her car, she went to the garage at the back of the house. Melissa saw her come out of the garage but could not see whether or not she was carrying a car part. Mildred drove off in her car, a reddish-orange 1973 or 1974 Chevrolet Malibu with a beige top and a green door on the passenger side. Mildred was never seen alive again by her family.

The Search
When Spires' mother, Edith Taylor, returned home from work around 6:00 p.m. on July 11, 1987, she became concerned about Mildred's not having returned home. By about 8:00 p.m., she was very concerned because it was very unlike Mildred to be gone from home so long. About 3:00 a.m. of the morning of July 12, Edith Taylor told her daughter Melissa that she "had to start looking" for Mildred. Mildred's father, Johnny Spires, Sr., joined Edith Taylor and Melissa Spires in the search for Mildred. The three looked for Mildred first at Taylor's house and, not finding her there, at various motels. Edith Taylor was convinced that Mildred "was with [Taylor], that he had her." She thought this because Taylor had twice called Mildred earlier on the telephone and asked her to meet him.
The three were unsuccessful in their efforts to locate Mildred, and around noon on Sunday, Edith reported Mildred's disappearance to the police. She spoke to Jackson Police Department Detective Patsy Knowles.

Family Relations and Events Preceding Disappearance
Shortly after their marriage in 1984, Edith and Taylor moved to the Magnolia Street home where Edith and her two daughters were living at the time of Mildred's disappearance. In the latter part of May 1987, Edith filed for a divorce from Taylor and within days, Taylor moved out of the Magnolia Street house and into a house on Columbus Street in the same neighborhood. Between the time he moved out and the time Mildred disappeared, there continued to be contact between Taylor and Edith, Mildred, and Melissa. On the Wednesday and Thursday before Mildred disappeared, Taylor had, at Edith's request, gone to the Magnolia Street home and repaired the brakes on Mildred's car. On the day of Mildred's disappearance, Taylor had, at about 3:00 p.m., gone to the beauty shop where Edith worked and insisted on talking with her. When she refused, he left angry. When he telephoned her about five minutes later, using profane language and insisting that she talk with him, she hung up on him.
In June of 1987, Taylor talked with Stanley Evans, an employee of the laundromat which he used. Evans had worked at the laundromat since his release from Parchman and had seen Taylor in the business but had not known him by name and had engaged in no conversation with him until that date. Taylor told Evans that "he had a good woman but they were going to get a divorce ..." Taylor got "madder and madder" as he and Evans talked about women and told Evans that "he had to find a way to get even with  that bitch," meaning his wife. Evans quoted Taylor as saying:

*1254 [H]e said, "I know, he said" he said, "She love them girls so much," he said, "I can do something to one of them daughters." He said, "I can do something to them daughters," and he said she loved them  "she loved them so much that would be the ticket." He said, "That will be it."
After Mildred's body was found, Evans recounted this conversation to the police.

The Investigation and C.W. Taylor's Activities Between July 11, 
1987 and September 1, 1987
Taylor spent most of the day of July 11, 1987, with his girlfriend, Fairy Warren. They went to garage sales until about 3:00 p.m. Shortly after they left the last garage sale, his car ran hot and he had to get somebody to "boost him off." He drove Warren to her home and left. He telephoned her at 7:00 p.m. and suggested that they get dressed and go out. He went to her house about fifteen or twenty minutes later and they went out to a restaurant. When they left the restaurant they stopped by her sister-in-law's house to pick up her children, but the children "had already made it back to the house." They then drove to Taylor's home to pick up a fan to take to Warren's house. After Taylor returned to the car with the fan, his car wouldn't start so they walked from his house to Warren's. Taylor stayed the night with Warren; he slept in his clothes and was gone when she arose. He returned to her house on foot about 10:00 a.m. with a starter for his car. Warren asked about scratches on his face and he told her that he and Edith had been in a fight at his house. Taylor left Warren and when he came back, he had a note from the police which had been left on his door.
On Sunday, July 12, Detective Patsy Knowles began the investigation into Mildred Spires' disappearance after leaving Edith's house. Detective Knowles went to Taylor's home, and finding no one there, left a note for him to call her. He telephoned her about 5:00 p.m. from Fairy Warren's house. Taylor told Detective Knowles that his estranged wife thought he had something to do with Mildred's disappearance. In response to Detective Knowles's questions about where he had been during the weekend, Taylor said he had been with Fairy Warren. When asked about any contact or conversation with Mildred Spires, he said that he had talked to Mildred but that she had not shown up at his house to bring an auto part as he had asked. At Detective Knowles' request, Warren accompanied Taylor to police headquarters and, as they got out of the elevator there, he told Warren that if asked about the scratches on his face, she should say she put them there.
Detective Knowles noticed what appeared to be fresh scratches on Taylor's face and his right hand; she asked him to take off his shirt and observed what appeared to be fresh claw marks on his chest. When Detective Knowles asked for an explanation of the scratches, Taylor said that he and Warren had had an argument early Saturday morning over a woman; he had slapped Warren, and that she had scratched him. When Detective Knowles questioned Taylor, she pointed out to him that if he had anything to do with Spires's disappearance, his fingerprints would be on Spires' car. During questioning of Warren, when Detective Knowles pointed out that Warren's nails were not long enough to scratch, Warren changed her story. Warren told Knowles that she had not scratched Taylor and that he had asked her when they were in the elevator to say she had done so. Warren said she had lied for Taylor because she was afraid of him. When she left the police department, Warren went to work. Taylor later telephoned Warren and asked her what she had told Detective Knowles. She told him that she had told the detective that she had not put any scratches on him. Taylor had told Warren that "somebody that he was messing around with" had put the scratches on him, "[a] girl named Tiffany, or somebody, I don't know, work on Minerva Street."
When Detective Knowles confronted Taylor with what Fairy Warren had told her, he told Knowles that it was Tammy or Tiffy, a prostitute living on Minerva Street who had scratched him. When Detective Knowles asked Taylor to accompany her to Minerva Street to verify his story, they went to a *1255 duplex pointed out by Taylor and spoke to Tammy Robertson, who answered the door. Taylor said that Tammy Robertson was not the person who had scratched him.
On Sunday night, July 12, the police, with Taylor's permission, searched his house and automobile and found no evidence to connect him with Mildred Spires' disappearance.
On the Tuesday following Mildred's disappearance, Taylor went to the house of Beatrice Young and offered her fifty dollars to find a prostitute who would tell the police that she had put the scratches on his face.
On August 9, 1987, Taylor went to the home of Josephine Magee, a woman he had known and had been a close friend for fourteen years. He told Magee that he had a problem:
He asked me why do the people he loved the most he hurts, he always hurt. So then he told me that  said that he had killed his step-daughter and  told me that he had carried her out on Highway 80 
Taylor told Magee that he had telephoned Mildred and asked her to bring him a starter for his car. He told Mildred to look in the garage for the starter but that she had not been able to find it. He said that Mildred had asked him if he wanted her to bring the car over for him to go and get a starter and he had told her to do so. Taylor told Magee that he and Mildred had gone riding on Highway 80 and that he had killed Mildred. He did not tell her where Mildred's body was, but offered to tell or show her where the body was if she wanted to collect "some award [sic] money." She wasn't interested in a reward and he did not tell her the location of the body. She did not go to the police with this information because she was afraid of Taylor but was later contacted by Detective Knowles and gave the detective that information.
On September 1, 1987, twelve year old Michael Evans, accompanied by a friend, was cutting across a wooded area on his way home from school when he came across an abandoned automobile and saw a body inside. He and his friend ran to another friend's house and his companion's mother called the police.
Police investigation identified the vehicle as the car Mildred Spires had been driving on the day she disappeared. The partially decomposed body, found with the trunk and legs across the back seat and the head and upper torso off the seat in the foot well, was identified by clothing and personal effects as that of Mildred Spires. The gas tank of the car was full, the windows were open, and the car contained an empty bag which had contained Doritos Ranch chips and an unopened gallon of milk. There was white spray paint on the steering wheel, dashboard, doors and door handle of the car. The item which normally hung on the rearview mirror was elsewhere in the car, an ashtray was broken, and some of Mildred's personal effects were found under the backseat cushion.
An autopsy was performed and the pathologist concluded that the cause of death was probably strangulation.

I. SUFFICIENCY AND WEIGHT OF THE EVIDENCE
Taylor challenges the legal sufficiency of the evidence to support a guilty verdict and also contends that the verdict was against the overwhelming weight of the evidence. He maintains that, because the State had no eyewitnesses to the crime, had no fingerprints or other physical evidence linking him to the crime, the jury must have based its verdict on "incriminating statements that Taylor supposedly made to a number of unsavory strangers" and "impermissible conjecture and speculation." He contends that the evidence was insufficient and weighed in favor of acquittal.

Sufficiency of the Evidence
When reviewing a challenge to the sufficiency of the evidence, this Court considers all of the evidence in the light most consistent with the verdict, giving the State the benefit of all inferences favorable to the verdict. When the evidence before the jury is such that reasonable jurors could have found the defendant guilty, the verdict is beyond the Court's authority to disturb. McFee v. State, 511 So.2d 130, 133-34 (Miss. 1987).
*1256 The jury was instructed that, to find Taylor guilty of capital murder, it must find beyond a reasonable doubt that: (1) Taylor was under sentence of life imprisonment, and (2) Taylor, without authority of law and not in reasonable self-defense, murdered Mildred Spires. Taylor contends that because the witnesses who testified that he had made incriminating statements to them were "unsavory strangers," their testimony is unreliable, unbelievable, and constituted insufficient evidence on which to base a conviction. He specifically points to the fact that Stanley Evans was an ex-convict with prior convictions for house burglary and grand larceny who admitted that he was a police informant.
The evidence in this case, if believed by the jury, is sufficient to support a conviction without eyewitnesses to the crime or physical evidence linking Taylor to the crime. The testimony of the witnesses showed that Taylor was angry with his wife and planned to "get her" by harming one of her children. On July 11, 1987, Taylor had two angry confrontations with Edith Taylor and within an hour or so of the last of these confrontations, he telephoned Mildred Spires. Taylor had no alibi from about 5:00 p.m. until 7:00 p.m. when he telephoned his girlfriend. Taylor gave conflicting accounts of the scratches on his face and body and none of the accounts could be verified. His girlfriend told police that Taylor had asked her to lie and say that she had scratched him. Shortly after he was questioned, Taylor asked a friend to find a prostitute whom he could pay to say she had scratched him. About a month later, he told another friend that he had killed Mildred Spires. Mildred's decomposed body was found in her own automobile on September 1, 1987. The jury, having heard all of the witnesses who were thoroughly cross-examined and giving their testimony weight, could reasonably have reached a guilty verdict.

Weight of the Evidence
When reviewing a challenge to the weight of the evidence, this Court must determine whether the trial judge abused his discretion in denying a new trial. This Court, accepting as true all evidence favorable to the State, will determine whether "the verdict is so contrary to the overwhelming weight of the evidence that to allow it to stand would be to sanction an unconscionable injustice." Wetz v. State, 503 So.2d 803, 812-13 (Miss. 1987).
Based on the evidence presented, the jury verdict was not against the overwhelming weight of the evidence.

II. TESTIMONY OF DR. GALVEZ
Taylor contends that the trial court erred in denying his motion in limine to preclude the testimony of Dr. Rodrigo Galvez, the pathologist whose testimony was offered by the State to prove the cause of death.[1] Taylor contends that Dr. Galvez's testimony should not have been admitted because it had no probative value and because Galvez submitted two separate autopsy reports which the defense characterizes as contradictory.
The evidence taken at the hearing on the motion to exclude Galvez's testimony showed that Dr. Galvez had performed an autopsy on the body identified to him as that of Mildred Spires on September 1, 1987. The report of that autopsy concluded that "[c]ause of death cannot be established but certainly a neck trauma (strangulation) can be entertained." Without further examination of the body, Dr. Galvez later issued a second autopsy report which, in his view, was not inconsistent with the first report. In the second report, he concluded that death was a consequence of strangulation.
At trial, Dr. Galvez was qualified as an expert witness in the area of pathology. His testimony indicated that in determining the cause of death he had taken into account circumstantial factors as well as the findings gleaned upon examination of the corpse. He testified that he had issued the second autopsy *1257 report only because he thought he had failed to file the original autopsy report.
The State was required to prove as a part of the corpus delicti that the victim's death was a result of criminal agency and the usual way of proving that element in homicide cases is through proof of cause of death. While Dr. Galvez, as an experienced pathologist who had performed more than 3,000 autopsies, could not with certainty pinpoint the cause of death of the decomposed body, he could offer an opinion which would tend to make the cause of death more probable than it would have been without the testimony.
Taylor contends further that Dr. Galvez's two autopsy reports were inconsistent and would not meet the requirement for expert testimony of M.R.E. 702 that it "assist the trier of fact to understand the evidence or to determine a fact in issue." This Court has said that expert testimony should be admitted only when the trial court can affirmatively answer the two-fold inquiry: (1) whether the expert's field is one in which it has been scientifically established that investigation and study in conformity with practices in the field will produce a valid result; and (2) whether the proposed testimony will assist the trier of fact. Hosford v. State, 560 So.2d 163, 168 (Miss. 1990). Taylor does not challenge the scientific validity of the field of pathology but contends that Dr. Galvez's testimony was not such testimony as would be helpful to the jury and would tend to confuse them. Taylor cites no authority for the proposition and offers no instance in which this or any other court has required that the testimony of an expert witness be excluded if the witness has made multiple statements which differ in some respects from each other.
Any expert can offer an opinion if the expert witness possesses knowledge of the subject which is not possessed by a layman. Goodson v. State, 566 So.2d 1142, 1145 (Miss. 1990); cf. Keys v. Rehabilitation Centers, Inc., 574 So.2d 579 (Miss. 1990). Since Dr. Galvez clearly possessed greater skill than any member of the jury or any layman in determining the cause of death from a decomposed body, the trial court was not in error in admitting his testimony even though his testimony was not entirely consistent. West v. State, 519 So.2d 418, 426 (Miss. 1988). Dr. Galvez was subject to rigorous cross-examination and the jury was free to disregard his testimony entirely or in part. The jury had both autopsy reports as well as Dr. Galvez's explanation for writing two reports. There was no error in admitting the testimony of Dr. Galvez.

III. SPEEDY TRIAL
Taylor claims that he was denied his constitutional right to receive a speedy trial, as guaranteed by the Sixth Amendment to the United States Constitution and Article 3, § 26 of the Mississippi Constitution of 1890. He makes no claim concerning the statutory 270-day rule found in § 99-17-1 of the Mississippi Code.
The State argues that the speedy trial calculations should begin to run from the date of the last indictment, stating that the speedy trial slate was wiped clean following each re-indictment. This reasoning, however, is flawed. Unlike the 270-day rule, the constitutional right to a speedy trial attaches at the time of the accused's arrest, indictment, or information. Smith v. State, 550 So.2d 406, 408 (Miss. 1989). Since Taylor was arrested on September 3, 1987, the constitutional clock began to tick from that point. The prosecution may not circumvent an accused's demand for a speedy trial by seeking a new indictment for the same offense and then proceeding upon the new indictment. Beavers v. State, 498 So.2d 788, 791 (Miss. 1986). The State's "clean slate" argument seems suspect, especially since Taylor remained incarcerated during this entire period of time from arrest to trial.
When analyzing the speedy trial question, the following chronology of events is helpful in providing insight into this issue:

Chronology
7/11/87 Mildred Spires last seen leaving her home.
7/24/87 C.W. Taylor assaults his ex-wife, Edith Taylor (Mildred's mother), with an iron pipe while sleeping, thereby crushing facial bones.
*1258 9/1/87 Body of Mildred Spires found in car located in a wooded area.
9/3/87 C.W. Taylor arrested.
10/13/87 Taylor indicted and charged with capital murder during the commission of a kidnapping.
11/2/87 John Reeves appointed counsel for Taylor.
11/9/87 Order withdrawing John Reeves as counsel and replacing him with Cynthia Ann Mitchell and W.E. Gore due to Mr. Reeves's service in the state legislature.
11/28/88 State granted continuance until 1/10/89 for capital murder trial in order to try the pending 7/24/87, aggravated assault charge.
12/7/88 Taylor indicted and charged with capital murder during the commission of a kidnapping and/or under sentence of life imprisonment.
2/7/89 Taylor granted a continuance until 3/29/89 in order to obtain additional discovery as a result of his re-indictment.
4/14/89 Taylor convicted on aggravated assault charge.
5/11/89 Taylor filed pro se motion for immediate trial.
5/23/89 Taylor granted a continuance until 7/25/89 because one of the defense attorneys has a conflicting murder trial scheduled.
6/6/89 Taylor indicted a third time for capital murder, alleging murder in the commission of a kidnapping, or while under a life sentence, and as an habitual offender.
7/10/89 Taylor arraigned on 6/6/89 indictment.
7/10/89 Taylor filed pro se motion to dismiss for lack of speedy trial.
7/24/89 Both parties granted a continuance until 9/11/89.
8/14/89 Order of Nolle Prosequi entered, wherein State dismisses indictments dated 10/13/87 & 12/7/88 following Taylor's re-indictment on 6/6/89.
8/23/89 Taylor filed pro se motion to remove Cynthia Mitchell and W.E. Gore as defense counsel.
8/30/89 Motion to dismiss for lack of speedy trial filed by defense attorneys.
9/12/89 Order entered removing Mitchell and Gore as Taylor's counsel.
9/18/89 Order entered installing Connie Johnson and Jim Kitchens as defense counsel for Taylor.
9/26/89 Discovery requested by newly appointed attorneys.
1/25/90 Defense motion filed for change of venue.
2/2/90 Order entered granting change of venue to Jackson County.
2/20/90 Continuance granted  no reason stated.
5/10/90 Order entered changing venue to Hancock County due to crowded dockets.
6/27/90 Capital murder trial commenced.
In analyzing the constitutional right to speedy trial, we must again visit the familiar realm of Barker v. Wingo, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), and apply the four factors to the present case. The four Barker factors, to be balanced in light of all surrounding circumstances, are: (1) length of delay; (2) reason for delay; (3) defendant's assertion of the right to a speedy trial; and (4) prejudice to the defendant resulting from the delay. Barker, 407 U.S. at 533, 92 S.Ct. at 2193, 33 L.Ed.2d at 117. This analysis must turn on the facts of the particular case, the quality of evidence available on each factor and, in the absence of evidence, identification of the party with the risk of non-persuasion, with no sole factor being dispositive. Jaco v. State, 574 So.2d 625, 630 (Miss. 1990).

Length of Delay
Under Mississippi law, a delay of eight months is presumed prejudicial. Flores v. State, 574 So.2d 1314, 1322 (Miss. 1990); Smith, 550 So.2d at 408 (Miss. 1989). Taylor's constitutional clock began to run upon his September 3, 1987, arrest. He was finally tried on June 27, 1990, approximately 1027 days following his arrest. However, two continuances granted to Taylor specifically, and another continuance granted to both parties accounted for 162 days which *1259 when subtracted from the 1027 total, makes the number of days 865 before Taylor was tried. When plea negotiations of 360 days are subtracted from the remaining 865 total, the number of days is whittled down to 505. Taylor's pro se motion to remove prior counsel resulted in a twenty (20) day delay, which also should be deducted, bringing the total number of days down to 485, a period which is still presumptively prejudicial. However, when the "negligence" standard in Adams v. State, 583 So.2d 165 (Miss. 1991), is applied to this case in conjunction with further requests for discovery and trial preparation by Taylor's counsel, the delay decreases significantly. This Court has held delays of 456 and 414 days as not violative of a defendant's constitutional right to a speedy trial. See Adams, supra; Jaco, supra. Further, this Court does consider that both the State and the defendant Taylor were active in the management of pre-trial matters, and it is not likely that there was inattention by either party.

Reason for Delay
Any delay as a result of action by the State, without "good cause," causes the time to be counted against the State. A delay caused by the actions of the defendant, such as a continuance, tolls the running of the time period for that length of time, and is subtracted from the total amount of the delay. Wiley v. State, 582 So.2d 1008, 1011 (Miss. 1991); Flores, 574 So.2d at 1318. A bad motive on the part of the prosecution significantly affects the balancing test. Perry v. State, 419 So.2d 194, 199 (Miss. 1982).
Plea negotiations have been recognized by this Court as good cause for delay, thereby tolling the speedy trial clock. Reed v. State, 506 So.2d 277, 281 (Miss. 1987). Although Reed dealt with the 270-day rule, its reasoning can be applied in a constitutional context. Reed held that plea negotiations initiated and acquiesced to by the defendant constituted good cause. It is apparent that plea negotiations took place for almost a year following Taylor's arrest. Specifically, they took place from 12/13/87 until 12/6/88, a total of 360 days. These plea negotiations were terminated by the district attorney when he notified Taylor's attorney that the prosecution was withdrawing its plea bargain and would re-indict Taylor on 12/7/88. The letter also stated that the State planned to try the aggravated assault case before the murder trial. Because the plea negotiations constituted good cause, these 360 days should not be charged against the State since Taylor participated or at least acquiesced in them, as well as received some benefit from them. This Court does stress, however, the importance of documentation in plea negotiations in order to substantiate claims of plea negotiations.
Taylor's switching of attorneys on two occasions led to further delays. The first, however, was not his fault. His initial court-appointed attorney, John Reeves, withdrew from representation due to his involvement in the legislature, which was to convene soon. Mr. Reeves was replaced a week later with Cynthia Ann Mitchell and W.E. Gore. Ms. Mitchell and Mr. Gore represented Taylor from November 9, 1987, until September 12, 1989, when the court removed them as defense counsel pursuant to Taylor's pro se request. Taylor filed a pro se motion for a change of counsel on August 23, 1989, and the motion was granted September 12, 1989. Delays associated with the switching of defense counsel are beyond the control of the State, and therefore should be charged to the defendant. Wiley v. State, 582 So.2d at 1012. Therefore, twenty (20) more days should be charged to Taylor.
Following Taylor's motion to remove Mitchell and Gore as his defense counsel, he replaced them with Connie Johnson and Jim Kitchens on September 18, 1989. After Johnson and Kitchens were appointed, they moved for and were granted additional time for discovery. The case went to trial nine (9) months after the new attorneys were retained. In Adams, this Court recognized that additional discovery requests when it is apparent that the defendant is not ready for trial should not be weighed against the State. Adams, 583 So.2d at 168. It is clear that with Johnson and Kitchens being Taylor's new counsel, they would need ample time to complete their necessary discovery in an effort to present Taylor's best defense. This *1260 continued discovery as well as the attorneys' need for trial preparation should not be charged against the State.
On two occasions, Taylor asked for and was granted continuances. The first of these occurred from February 7, 1989, to March 29, 1989, a period of fifty (50) days. Next, a sixty-three (63) day continuance was granted from May 23, 1989, to July 25, 1989. A forty-nine (49) day continuance was granted to both parties from July 24, 1989, to September 11, 1989. These days, totaling 162 in number, are charged to Taylor since any delay attributable to the defendant tolls the constitutional speedy trial clock. Wiley v. State, 582 So.2d at 1012; Flores, 574 So.2d at 1319; Vickery v. State, 535 So.2d 1371, 1377 (Miss. 1988); Perry v. State, 419 So.2d at 199. It must weigh strongly against the defendant when he, of his own volition and for no compelling reason, changes attorneys in the immediate days prior to trial resulting in his new counsel's request for further discovery.
Taylor objected at the trial level as well as on appeal to the State's continuance, which allowed it to secure an aggravated assault conviction before trying the capital murder case. In Leatherwood v. State, 435 So.2d 645 (Miss. 1983), cert. denied, 465 U.S. 1084, 104 S.Ct. 1455, 79 L.Ed.2d 772 (1984), this Court held that crimes and convictions occurring subsequent to the murder but before the murder trial could be admitted into evidence as an aggravating circumstance. Id. at 651. However, since the State voluntarily chose to continue Taylor's capital murder trial until after the aggravated assault trial, the State should be assessed those days. The State's decision to delay Taylor's murder trial until after his aggravated assault trial certainly qualifies as "[a] deliberate attempt to delay the trial in order to hamper the defense [which] should be weighed heavily against the government." Barker, 407 U.S. at 531, 92 S.Ct. at 2192, 33 L.Ed.2d at 117. See also United States v. Marion, 404 U.S. 307, 325, 92 S.Ct. 455, 466, 30 L.Ed.2d 468, 479-80 (1971) (intentional delay to gain tactical advantage weighs against the prosecution). Therefore, this delay must be attributed to the State.
In the landmark case of Barker v. Wingo, the defendant Barker was put on trial five years following his arrest. Barker remained incarcerated for ten (10) months until he was able to make bail. Barker did not object to any of the prior eleven (11) continuances which the prosecution sought and was granted. These continuances were on account of the prosecution's efforts to secure the conviction of Barker's alleged co-conspirator, whom the prosecution hoped would testify against Barker, once convicted. Finally, after two hung jury trials, and two reversed convictions, Barker's alleged co-conspirator was found guilty. There were a total of sixteen (16) continuances granted in Barker. Barker objected to a twelfth continuance, and filed a motion to dismiss for lack of speedy trial. This was denied, and the prosecution was granted two more continuances on account of one of their witnesses being sick. After weighing all the factors, the United States Supreme Court held that Barker's right to speedy trial was not violated. First, the prejudice was minimal, Barker having been incarcerated for only ten (10) months. Finally, Barker did not want a speedy trial, hoping that his alleged co-conspirator would be exonerated of the charges against him, and therefore the charges against Barker would be dropped.
This Court must address the issue surrounding Taylor's original indictment and two subsequent re-indictments. The October 13, 1987, initial indictment charged Taylor with capital murder during the commission of a felony. Later, on December 7, 1988, Taylor was re-indicted, charging him with capital murder during the commission of a kidnapping and/or under sentence of life imprisonment. Finally, on June 6, 1989, Taylor was re-indicted again, charging him with capital murder during the commission of a kidnapping, or while under a life sentence, and as an habitual offender. On August 14, 1989, a nolle prosequi was entered on the first two indictments. In Adams, this Court held that the prosecution's delay caused by subsequent re-indictments constituted "negligence" and therefore this time should not be charged against the State. The subsequent re-indictments were the result of flawed multiple *1261 indictments which had been nolle prosequi. Arguably the State stood to gain some tactical advantage with each re-indictment, but it cannot be said that the State acted in bad faith. Absent a showing of bad faith on the State's part, the delay "weighs less heavily" against the State. Barker, 407 U.S. at 531, 92 S.Ct. at 2192, 33 L.Ed.2d at 117; United States v. Loud Hawk, 474 U.S. 302, 315, 106 S.Ct. 648, 656, 88 L.Ed.2d 640, 654 (1986); Jaco, 574 So.2d at 631; Saxton v. State, 394 So.2d 871, 875 (Miss. 1981). Therefore, when considering the delays associated with re-indictments, the "negligence" rationale in Adams weighs less heavily on the State.

Assertion of Right to Speedy Trial
Although it is the State's duty to insure that the defendant receives a speedy trial, a defendant has some responsibility to assert this right. Wiley, 582 So.2d at 1012; Flores, 574 So.2d at 1323. "Failure to assert the right will make it difficult for a defendant to prove that he was denied a speedy trial." Barker, 407 U.S. at 531-32, 92 S.Ct. at 2192-93, 33 L.Ed.2d at 117-18. The defendant's failure to ask for a speedy trial is not dispositive, but must be weighed against other factors. Vickery, 535 So.2d at 1377.
In the present case, Taylor did not assert this right until he filed his pro se motion to dismiss for lack of speedy trial on July 10, 1989. Taylor's attorneys (Mitchell and Gore) filed a motion to dismiss on August 30, 1989, but the motion was denied. The case finally went to trial a little less than one year from Taylor's pro se motion asserting his motion for speedy trial.

Prejudice to the Defendant
The final factor which needs to be considered is the prejudice to the defendant. The prejudice prong of the Barker test seeks to prevent oppressive pretrial incarceration, minimize anxiety and concern of the accused, and to limit the possibility that the defense will be impaired by the inability to locate witnesses or by failing memory of witnesses. Barker, 407 U.S. at 532, 92 S.Ct. at 2193, 33 L.Ed.2d at 118.
With respect to oppressive pre-trial incarceration, Taylor remained incarcerated the entire time following his arrest and parole revocation, which was about two years and ten months time. When Taylor was arrested, he was out on parole, having served a portion of a life sentence for a prior murder conviction. Since parole is a privilege and not a right, it can be revoked upon a mere showing of a "probable violation." See Miss. Code Ann. § 47-7-27 (1991 Supp.). When Taylor was charged with murder, the State was certainly well within its rights to revoke Taylor's parole and keep him incarcerated. Incarceration alone is not enough prejudice to warrant reversal. Williamson v. State, 512 So.2d 868, 877 (Miss. 1987); cf. Hansen v. State, 592 So.2d 114 (Miss. 1991), cert. denied, 504 U.S. 921, 112 S.Ct. 1970, 118 L.Ed.2d 570 (1992).
Taylor claims that due to his incarceration, he was unable to talk with potential alibi witnesses, many of whom may have had memory loss over the years. The State, however, argues that there is no mention in the record of any names of individuals who have suffered any memory loss, or who can no longer be found. Even though Taylor remained incarcerated the entire time, he was represented by counsel who could have run down leads at Taylor's direction.
Next, Taylor argues that he was prejudiced by the continuances granted to the State in order to try him on the aggravated assault charges. The assault conviction enabled the State to seek sentencing of Taylor as an habitual offender following his murder trial. This argument seems to have some merit. While the State enjoys the luxury of a tactical advantage of choosing the order in which charges will be prosecuted, it is not without consequence to the defendant. When one is sentenced as an habitual offender, he loses the opportunity for probation and parole. In Smith, this Court held that a defendant was prejudiced by the State's waiting to prosecute until another conviction was obtained. Smith, 550 So.2d at 409. Had Smith been tried earlier, he would not have been tried as an habitual offender. In the present case, the State claims Taylor was not prejudiced, since he was eligible for the *1262 death penalty after the first indictment, and that re-indictment did not subject Taylor to increased punishment.

Overall Balancing
As stated in Barker, the four factors have no magic qualities, and all must be weighed in a sensitive balancing process. Barker, 407 U.S. at 533, 92 S.Ct. at 2193, 33 L.Ed.2d at 118. The sole remedy for the denial of a defendant's right to a speedy trial is dismissal of the charges against him. Smith, 550 So.2d at 409; Perry v. State, 419 So.2d 194, 197 (Miss. 1982). Considering the reasons for the delays, plea bargaining, three continuances, Taylor's switching attorneys twice, motion for a change of venue, and requests for additional discovery and trial preparation, Taylor was not denied a speedy trial.

IV. EVIDENCE OF TAYLOR'S PRIOR MURDER CONVICTION.
Taylor was indicted under the statute that provides that "[t]he killing of a human being without the authority of law by any means or in any manner shall be capital murder in the ... case... [of] [m]urder which is perpetrated by a person who is under sentence of life imprisonment[.]" Miss. Code Ann. § 97-3-19(2)(b) (Supp. 1991). He moved, prior to trial, to prohibit evidence of his prior life sentence from going to the jury and for a Rule 6.04 hearing. He argued at the pre-trial hearing that the jury should not be told during the guilt phase that he had a prior conviction, but should be instructed on capital murder without that element, that is, that the court should determine whether there was a prior life sentence which elevated the killing of Mildred Spires to capital murder. The State countered that the life sentence being served by Taylor was an element of the crime of capital murder which the State was required to prove to the jury, that is, that the conditions which elevate murder to capital murder are issues of fact for the jury. The trial court, expressing concern that admission of Taylor's prior murder conviction might be so prejudicial as to create a problem, deferred ruling on Taylor's motion to exclude the prior conviction. The court later overruled the motion to exclude evidence of the prior murder conviction.
Taylor contends on appeal that the admission of evidence of his prior conviction requires reversal on four grounds. He alleges that: (1) the evidence was insufficient to prove the prior conviction; (2) the prejudicial nature of the evidence denied him a fundamentally fair trial; (3) he was not serving a life sentence as required by the statute; and (4) the trial court improperly denied the jury instruction regarding proof of the conviction.
To prove that Taylor was under a sentence of life at the time of the murder for which he was charged, the State offered a certified copy of the order of the prior conviction and life sentence and the testimony of Dick Bowie, Mississippi Department of Corrections Supervisor of Probation and Parole Services in Hinds County, testified that Taylor was on parole from a life sentence on July 11, 1987. That evidence was sufficient to prove that Taylor was under a life sentence at the time of the murder of Mildred Spires.
Taylor contends that the trial court erred in denying defense counsel's motion to exclude evidence of the prior life sentence and for a Rule 6.04 hearing.[2] Taylor argues that the admission of evidence of a prior life sentence was so prejudicial as to deny him a fair trial and that the trial court should have held a separate hearing to determine the validity of the prior conviction. The United States Supreme Court has declined to find a violation of due process rights when prejudicial evidence of prior crimes has been adduced at trial for purposes of sentence enhancement. Spencer v. Texas, 385 U.S. 554, 87 S.Ct. 648, 17 L.Ed.2d 606 (1967). We hold that when, as here, the evidence of a prior crime is a necessary element of the *1263 State's case, introduction of such evidence will not require reversal. Once the trial court ruled the evidence admissible, no limiting instruction was sought and none was given. In the future, the very least the trial court should do to limit the prejudicial effect of such evidence is to admonish the jury that such evidence may not be considered as evidence of the defendant's guilt of the charge for which he is being tried. An even better procedure would be that adopted by statute in Oregon which provides that the defendant may, prior to trial, stipulate with the prosecution to the prior conviction and sentence. Or. Rev. Stat. § 163.103 (1993). If the defendant does so stipulate, the court is required to accept the stipulation whether the prosecution agrees or not and the stipulation is made a part of the record, but does not go before the jury. The defendant has a clear choice of stipulating to the existence of his prior conviction or of having evidence of that conviction admitted into evidence. State v. Earp, 69 Or. App. 365, 368-70, 686 P.2d 437, 439-40 (1984). We suggest the use of this procedure when the State seeks a capital murder conviction based on the fact that the murder was committed by one under a sentence of life imprisonment.
Taylor contends that he was not serving a life sentence when he allegedly committed the murder of Mildred Spires and that he was therefore not "under life sentence" as contemplated by the statute. Neither Taylor nor the State cites any authority for an interpretation of § 97-3-19(2)(b). The State, however, argues persuasively that this Court's interpretation of essentially the same language in another portion of the death penalty statutory scheme is applicable here. In Lockett v. State, 517 So.2d 1317 (Miss. 1987), cert. denied, 487 U.S. 1210, 108 S.Ct. 2858, 101 L.Ed.2d 895 (1988), the defendant argued that a person on probation was not "under sentence of imprisonment" as contemplated by the statute setting forth aggravating circumstances in capital cases. The Court held that a person whose sentence has been suspended or who is on probation is deemed to remain under the sentence. Lockett v. State, 517 So.2d at 1337, citing, Evans v. State, 422 So.2d 737, 742 (Miss. 1982), cert. denied, 461 U.S. 939, 103 S.Ct. 2111, 77 L.Ed.2d 314 (1983). Since parole, like probation, is a matter of grace, Grantham v. Mississippi Department of Corrections, 522 So.2d 219, 226 (Miss. 1988), and can be revoked upon violation of the conditions of parole, Miss. Code Ann. § 47-7-27 (Supp. 1991), and since the legislature in § 97-3-19(2)(b) did not specify that the defendant must be serving a life term, we read the language of § 97-3-19(2)(b) to apply not only to persons serving a life term but also to those who are on parole from a life term.
In Taylor's final challenge concerning evidence of his prior crime, he contends that the trial court improperly denied his requested instruction D-18, which would have required the State to prove that his prior conviction was valid.
The language of § 97-3-19(2)(b) requires only proof that Taylor was "under a sentence of life." The evidence of Taylor's conviction and sentence was properly admitted without this instruction.

V. VOIR DIRE
First, Taylor claims that the circuit clerk improperly exercised authority to excuse fifty-eight (58) potential jurors from the original two-hundred fifty (250) person special venire. We find no merit in this argument. Potential jurors were excused for such reasons as age, medical conditions, financial hardships and prepaid vacations. In each case, the trial judge was informed of the circumstances and he told the clerk to excuse the person from jury service.
Next, Taylor claims that the prosecutor was allowed to extract a commitment from potential jurors to convict Taylor and to impose the death penalty. In West v. State, 553 So.2d 8 (Miss. 1989), this Court held that prosecutors can probe the prejudices of the prospective jurors to the end that all will understand the jurors' thoughts on the matters directly related to the issues to be tried. Id. at 22. The line between a proper and improper question is not always easily drawn; it is manifestly a process in which the trial judge must be given considerable discretion. Harris v. State, 532 So.2d 602, *1264 606 (Miss. 1988); Murphy v. State, 246 So.2d 920, 922 (Miss. 1971).
Although many of the prosecutor's questions were pointed, his questions included the word "consider." In fact, the prosecutor told the potential jurors that he was not trying to pin them down, stating: "I am just asking you to look into a crystal ball. I'm not trying to get you to tell me how you're going to vote, believe me, I'm not. I'm just asking if you can conceive that sort of thing." [on imposing the death penalty without an eyewitness] (emphasis added) These questions did not appear to extract any kind of commitment from the potential jurors, but merely "probed" into their prejudices in order to get some insight into their thoughts. See West, 553 So.2d at 22.
Taylor argues that it was impermissible for the prosecution to ask the venire whether they could impose the death penalty when there were no eyewitnesses or fingerprints linking the defendant to the crime. Four potential jurors stated that they probably could not, and that they would need a lot stronger proof to change their position, almost to the point of an admission. Because a juror's bias against the death penalty does not have to be proven with unmistaken clarity, the decision of whether or not to excuse the juror is left to the trial judge's discretion. Stringer v. State, 500 So.2d 928, 943 (Miss. 1986). Further, a juror need not expressly state that he absolutely refuses to consider the death penalty; an equivalent response made in any reasonable manner indicating the juror's firm position will suffice. Willie v. State, 585 So.2d 660, 673 (Miss. 1991); Williamson, 512 So.2d 868, 881 (Miss. 1987). Since the trial judge was present during the voir dire process, he was in a better position to evaluate the prospective jurors' responses. Williamson, 512 So.2d at 881. We therefore defer to his judgment on this matter.
Taylor further claims that four potential jurors were improperly excused on Witherspoon grounds. Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). "Prospective jurors in capital cases may only be excluded for cause based upon their views on capital punishment when those views would `prevent or substantially impair the performance [their] [sic] duties as juror[s] in accordance with [their] instructions and oath.'" Williamson v. State, 512 So.2d 868, 880-81 (Miss. 1987) (quoting Wainwright v. Witt, 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841, 851-52 (1985); Gray v. Mississippi, 481 U.S. 648, 658, 107 S.Ct. 2045, 2051-52, 95 L.Ed.2d 622 (1987)). As a juror's bias against the death penalty does not have to be proven with unmistaken clarity, the decision of whether or not to excuse the juror is left to the trial judge's discretion. Stringer v. State, 500 So.2d 928, 943 (Miss. 1986). The juror need not expressly state that he absolutely refuses to consider the death penalty; an equivalent response made in any reasonable manner indicating the juror's firm position will suffice. Willie, 585 So.2d at 673; Williamson, 512 So.2d at 881. Due to the trial judge's presence during the voir dire process, he is in a better position to evaluate the prospective juror's responses. Williamson, 512 So.2d at 881. Finally, the determination of whether a juror is fair and impartial is a judicial question, and will not be set aside unless such determination is clearly wrong. Carr v. State, 555 So.2d 59, 60 (Miss. 1989); King v. State, 421 So.2d 1009, 1016 (Miss. 1982), cert. denied, 461 U.S. 919, 103 S.Ct. 1903, 77 L.Ed.2d 290 (1983).
The cases of Adams v. Texas, 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980) and Wainwright v. Witt, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985) spurned the development of the Adams-Witt standard which was adopted by this Court in Balfour v. State, 598 So.2d 731, 755 (Miss. 1992) and Hansen v. State, 592 So.2d 114, 128 (Miss. 1991), cert. denied, 504 U.S. 921, 112 S.Ct. 1970, 118 L.Ed.2d 570 (1992). In both Balfour and Hansen, this Court considered the holding of Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). The Witherspoon line of cases establishes the general proposition that a "juror may not be challenged for cause based on his views about capital punishment unless those views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." Adams v. Texas, 448 U.S. 38, 45, 100 S.Ct. 2521, 2526, 65 L.Ed.2d 581 (1980) (reaffirmed *1265 in Wainwright v. Witt, 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985)).
Stated another way, a prospective juror merely stating general objections or expressing conscientious or religious scruples against inflicting the death penalty is not enough for that juror to be excused for cause. Willie v. State, 585 So.2d 660, 672 (Miss. 1991) (citing Witherspoon v. Illinois, 391 U.S. 510, 522, 88 S.Ct. 1770, 1777, 20 L.Ed.2d 776 (1968)). If a juror who is opposed to the death penalty indicates that, if convinced of a defendant's guilt, he could return a verdict of guilty which might result in the death penalty, then the juror cannot be struck from the jury. Willie, 585 So.2d at 672-73. However, if a prospective juror is irrevocably committed to vote against the death penalty regardless of the facts and circumstances, then the prospective juror can be struck from the jury. Witherspoon, 391 U.S. at 522 n. 21, 88 S.Ct. at 1777 n. 21; Williamson v. State, 512 So.2d 868, 881 (Miss. 1987).
"This Court recognizes that it is often difficult for a juror to express in precise terms his or her feelings about, understanding of, and willingness to impose the death penalty. This difficulty of verbally expressing such views, of course, makes the interpretation of the juror's voir dire extremely difficult. We therefore look to not only the ruling but the setting and time devoted to the questions, and the opportunity of sequestered voir dire. Finally, we also examine and consider the overall care and concern given to developing the issues to be determined by the voir dire." Simon v. State, No. 91-DP-00353, slip op. at 16-17, ___ So.2d ___, ___-___ [1995 WL 49560] (decided February 9, 1995). In the present case, the four potential jurors were properly excused only after they stated their inability to impose the death penalty.
Finally, Taylor claims that he was denied due process and a fair cross section of the community when three potential jurors, namely one doctor and two attorneys, were excused by the trial judge. The trial judge stated in the record that he does not automatically exclude doctors or lawyers from jury service, but he allows them, as well as teachers and heads of government agencies, the opportunity to supply valid reasons why they can not serve on a jury. In this case, the doctor in question was an emergency room physician, who had just come from working the night shift and was to continue working that shift in the future. A reading of the record shows that the judge excused the attorneys not because they were attorneys, but because they operated small businesses which could not afford to be closed. Since the trial judge excused several other potential jurors who would experience hardships because they operated small businesses, it does not appear that the judge showed any bias toward the three professionals.

VI. THE PROSECUTOR'S MISCONDUCT VIOLATED TAYLOR'S RIGHTS UNDER THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS

A. The prosecutor referred to Taylor's exercise of his right to remain silent

During cross-examination, witness Josephine Magee, an acquaintance of Taylor, and the defense attorney had the following exchange:
Question: But he came all the way over to your house, ever how far it is, and we don't know, but he came all the way over there in his sister's truck and told you what you said.
Answer: Well, there C.W. is. Ask him didn't he tell me this.
Question: I'm asking you, ma'am.
Answer: Well, I just want you to know that I don't have to lie up on the witness stand.
In closing arguments, the prosecutor made the following reference to Magee's testimony:
"As Josephine sat right up there and said, `He's just like my brother, but let me tell you this: If he didn't tell me that, you ask him, because I'm sitting right here and I'm looking him in the eye and I'm telling you he told me he killed that girl, and if you don't believe it, ask him."
*1266 The prosecution is prohibited from making a direct comment, or reference by innuendo or insinuation to a defendant's failure to testify on his own behalf. U.S.C.A. Const. Amend. 5, Ladner v. State, 584 So.2d 743 (Miss. 1991). As stated in Ladner, the question is whether the comment of the prosecutor can reasonably be construed as a comment on a failure to take the stand.
Statements made by the prosecution must also be considered in light of this Court's observation that "counsel should be given wide latitude in their arguments to a jury ... Courts should be very careful in limiting the free play of ideas, imagery and the personalities of counsel in their argument to a jury." Johnson v. State, 477 So.2d 196, 209 (Miss. 1985). However, counsel is clearly limited to arguing facts introduced in evidence, deductions and conclusions he or she may reasonably draw therefrom, and the application of the law to the facts. Ivy v. State, 589 So.2d 1263 (Miss. 1991). It is within these guidelines that the prosecutor's reference to Magee's testimony must be considered. Although this issue presents a close question, there is authority to support a decision that there was no reversible error.
This Court has stated that "although a direct reference to the defendant's failure to testify is strictly prohibited, all other statements must necessarily be looked at on a case by case basis." Jimpson v. State, 532 So.2d 985, 991 (Miss. 1988). In Butler v. State, 608 So.2d 314 (Miss. 1992), the defendant did not take the stand but had made more than one statement to the authorities which were admitted into evidence. In closing arguments, the prosecutor stated:
Ladies and Gentlemen, that is an admission of guilt, but I submit to you she hasn't told you the whole truth yet.

... .
Ladies and Gentlemen, those bruises were not inflicted by the same wound that created the massive internal injuries that subsequently killed this child. It could not have happened. So, Ladies and Gentlemen, she has not yet told you the whole truth of the torment she subjected her son to. You still don't know the whole story. Incredible, unbelievable evasion from start to finish... .
Id. at 318. (emphasis added).
This Court concluded:
The prosecution could hardly have made the point plainer if it had simply come out and said, "There is a lot more to tell, but Butler has not seen fit to get on the witness stand and tell you."
These comments were reversible error, so egregious in fact that even if there had been no objection at trial, we would nevertheless have been obligated to reverse.
Id. at 319.
First, it must be recalled that it was during cross-examination by the defense counsel that Magee's unelicited comments were made. It is suggested that by taking no affirmative steps to correct what would later become a valid part of the evidence, the defense counsel erred. Instead of objecting to the witness' answer as being unresponsive and requesting the court to instruct the jury to disregard Magee's statements, defense counsel simply continued asking questions.
Second, the prosecutor's statements involved in the case at bar are not comparable to the "egregious," and direct comments easily found to constitute reversible error in Butler. The prosecutor is allowed, as the Butler Court noted, to properly evaluate the "weight and worth of what was in evidence," while at the same time he must refrain from impermissibly referring to the defendant's failure to testify. Butler, 608 So.2d at 318. (emphasis in original). In this case, the prosecutor was clearly referring to the testimony of Magee, in evidence. As such, the prosecutor's remarks could more easily be characterized as a summary of Magee's testimony rather than a reference of his own to the defendant's failure to testify.
In Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), extensive comments by the prosecutor and instructions by the trial judge allowed the jury to draw adverse inferences from the petitioners' failure to testify. The United States Supreme Court reversed the convictions, finding "petitioners are entitled to a trial free from the pressure of unconstitutional inferences." Id. *1267 at 24, 87 S.Ct. at 828. The significance of the case, however, was in the Court's approval and use of a harmless error analysis to determine whether reversible error results from reference to a defendant's failure to testify. First noting that every state has a harmless error rule or statute, the Court stated:
All of these rules, state or federal, serve a very useful purpose insofar as they block setting aside convictions for small errors or defects that have little, if any, likelihood of having changed the result of the trial. We conclude that there may be some constitutional errors which in the setting of a particular case are so unimportant and insignificant that they may, consistent with the Federal Constitution, be deemed harmless, not requiring the automatic reversal of the conviction.
The Supreme Court went on to hold, "that before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." Id. at 24, 87 S.Ct. at 828.
In reversing, the Court noted that the "machine-gun repetition of a denial of constitutional rights, designed and calculated to make petitioners' version of the events worthless," could not be considered harmless. The record indicated that direct comments on the petitioners' failure to testify occurred no less than thirty (30) times throughout the trial. The Court concluded:
And though the case in which this occurred presented a reasonably strong `circumstantial web of evidence' against petitioners, ... it was also a case in which, absent the constitutionally forbidden comments, honest, fair-minded jurors might very well have brought in not-guilty verdicts. Under these circumstances, it is completely impossible for us to say that the State has demonstrated, beyond a reasonable doubt, that the prosecutor's comments and the trial judge's instruction did not contribute to petitioners' convictions.
Id. at 24, 87 S.Ct. at 828.
This Court, in the recent case of Hansen v. State, 592 So.2d 114 (Miss. 1991), utilized the authority recognized in Chapman "to hold offenses to certain of an accused's constitutional rights do not per se require reversal." Id. at 135. The Court in Hansen stated the reviewing court must first objectively examine the instructions and evidence considered by the jurors in reaching their verdict. The final analysis is whether:
the force of the evidence presumably considered by the jury in accordance with the instructions is so overwhelming as to leave it beyond a reasonable doubt that the verdict resting on that evidence would have been the same in the absence of the ... [rights violation]... .
Hansen, 592 So.2d at 136, citing Yates v. Evatt, 500 U.S. 391, 405, 111 S.Ct. 1884, 1893, 114 L.Ed.2d 432, 449 (1991), disapproved on other grounds by, Estelle v. McGuire, 502 U.S. 62, 73 n. 4, 112 S.Ct. 475, 482 n. 4, 116 L.Ed.2d 385, 399 n. 4 (1991).
The jury in the instant case was instructed that in order to convict Taylor for capital murder it must find, beyond a reasonable doubt that: 1) Taylor was under sentence of life imprisonment, and 2) Taylor without authority of law and not in reasonable self-defense, murdered Mildred Spires. The jury in this case had sufficient evidence to support its finding of Taylor's guilt, and that the verdict was not against the overwhelming weight of the evidence.
Looking at the evidence before the jury, we find:
(a) The testimony of several witnesses indicated that Taylor was angry with his ex-wife and determined to "get her," or get even by harming one of her children.
(b) On July 11, 1987, Taylor had two heated confrontations, one in person with his ex-wife, Edith Taylor, and within an hour of the last confrontation, Taylor had telephoned Edith's daughter, Mildred, the victim in this case.
(c) Taylor could not establish an alibi for his whereabouts from 5:00 p.m. until 7:00 p.m. on July 11, the date Mildred was last seen alive.
(d) Taylor gave several conflicting explanations for fresh claw marks appearing on his face and body noted by Detective Knowles on July 12, the day following Taylor's *1268 conversation with Mildred and her disappearance. None of the explanations could be verified.
(e) Taylor requested that his girlfriend, Fairy Warren, lie to the police and tell them she had scratched him in an argument.
(f) Taylor asked a friend to find a prostitute whom he could pay $50 to say she had scratched him.
(g) During questioning, Detective Knowles pointed out that if Taylor was responsible for Mildred's disappearance, his fingerprints would be found on her car. When recovered, the steering wheel, dashboard, doors and door handles of Mildred's car had been spray painted white.
(h) Most significantly, Taylor confessed to a close personal friend that he had killed Mildred Spires.
The evidence, coupled with the proper instructions issued the jury, allowed it to clearly find Taylor guilty beyond a reasonable doubt, which it did. Having overcome the first step, this Court is then left to "evaluate the persuasive force" of the prosecutor's impermissible references to Taylor's failure to testify, that is, the effect of his reference to witness Magee's testimony. Hansen, 592 So.2d at 137. Here, the prosecutor, in a trial transcript of some twelve hundred pages, was said to have impermissibly commented on one occasion, albeit indirectly, on Taylor's failure to take the stand. It seems beyond question that the probability of this one reference to Magee's testimony, when balanced against the evidence permissibly before the jury, having had any "persuasive force" in this verdict is next to none. The prosecutor's error was harmless beyond a reasonable doubt.
Nearly twenty years after Chapman, in United States v. Hasting, 461 U.S. 499, 103 S.Ct. 1974, 76 L.Ed.2d 96, (1983) the Court stated: "Since Chapman, the Court has consistently made clear that it is the duty of a reviewing court to consider the trial record as a whole and to ignore errors that are harmless, including most constitutional violations." Id. In finding that the Court of Appeals erred in reversing the convictions based on a finding that the prosecutor's statements improperly commented on the defendants' failure to testify, the Supreme Court noted: "Here, the Court of Appeals, while making passing references to the harmless-error doctrine, did not apply it. Its analysis failed to strike the balance between disciplining the prosecutor on the one hand, and the interest in the prompt administration of justice and the interest of the victims on the other." Id.
Looking at the entire record in the case at bar, the prosecutor's summary of Magee's testimony is not at all comparable to the situations presented in cases like Butler or Chapman, where the prosecutor's statements certainly prejudiced the defendants. Here, the one possible, indirect reference to Taylor's failure to testify was indeed harmless. The comment was isolated, indirect and merely a paraphrasing of a witness' earlier testimony. Further, the failure of the defense to have witness Magee's comments stricken from the record should be considered. Without such action, the testimony remained a valid part of the evidence and could be summarized or commented upon by the State. The error presented is clearly not of the magnitude to constitute reversible error.

B. The prosecutor made improper comments about Taylor's defense counsel

Taylor complains about the following remarks made during the State's closing argument:
MR. DELAUGHTER: And it was said to you that these admissions that he committed this crime were not made to any law enforcement officer, no policeman to come up here and tell you we have a signed confession of this defendant. He talked to who he trusted. And I want to tell you right now, if we had put on a police officer or detective that said, "I've got a confession from this guy," they would have been up there telling you that the police beat it out of him. You can't win.
MR. KITCHENS: Your Honor, we object. That's improper argument. There's no such thing to support a statement like that.

*1269 THE COURT: Let's don't argue outside the record.
MR. DELAUGHTER: (CONTINUING) I can tell you this much, there's no way you can ever satisfy defense lawyers. If you have it one way, they will get up here and say, scream to you it should have been another. You just can't get it done 
MR. KITCHENS: Your Honor, we continue to object. This is improper argument, and move for a mistrial.
THE COURT: It will be overruled.
Taylor contends the prosecutor was allowed to make "highly derogatory comments about defense counsel," comments which also improperly deflected the jury's attention from the issues at hand.
First, it must be noted that the defense counsel during opening arguments challenged Taylor's alleged admissions based on the fact that they were not made to persons in authority. Defense counsel concluded, "I think you will find it exceedingly unlikely that these witnesses are being completely truthful with you." In closing argument, the State was obviously attempting to rebut the defense's inferences that the State's witnesses were not reliable or truthful because they were not law enforcement officers; the State argued no witness would be good enough in the defense's view. It could certainly be found, as the lower court did in Clemons v. State, 320 So.2d 368 (Miss. 1975), in overruling the defense's objection to such argument, that counsel for the defendants "initially interjected that subject into the trial." Id.
In United States v. Jennings, 724 F.2d 436 (5th Cir.1984), defense counsel suggested the government's female witnesses had engaged in various illegal acts and "intimate relationships" with a government investigator and also complained that the witnesses would not answer questions before the trial. During closing arguments, the prosecutor rebutted the charges by commenting:
[Y]ou observed the way they treated those ladies here in this courtroom. I mean the gall that they had to ask them the questions they did and treat them the way they did right here in front of ya'll, can you imagine  can you imagine what these gentlemen would have done if those ladies had dared talk to them out on the street.
Id. at 444.
The Court declined to find reversible error in the prosecutor's remarks, stating: "In light of these attacks upon the credibility of the government witnesses, the prosecutor was `not obliged to sit quietly while character assaults [were] made on his witnesses; he [was] entitled to argue fairly their credibility.'" Id. at 443; United States v. Bright, 630 F.2d 804 (5th Cir.1980). The Jennings Court concluded, "Moreover, even if the prosecutor's remarks are construed as an attack upon defendant's counsel, we do not find ... error ... sufficiently prejudicial to warrant reversal." 724 F.2d at 443-44.
This Court in Monk v. State, 532 So.2d 592 (Miss. 1988), discussed the wide range within which counsel may properly argue:
The right of argument contemplates liberal freedom of speech and range of discussion confined only to bounds of logic and reason; and if counsel's argument is within the limits of proper debate it is immaterial whether it is sound or unsound, or whether he employs wit, invective and illustration therein. Moreover, figurative speech is legitimate if there is evidence on which it may be founded. Exaggerated statements and hasty observations are often made in the heat of debate, which, although not legitimate, are generally disregarded by the court, because in its opinion they are harmless.

Id. at 601. (emphasis in original). In the above-emphasized language in Monk, the Court was specifically contemplating the kind of situation which occurred in the case at bar. Counsel's remark that "defense lawyers" are never satisfied with the evidence presented was obviously directed toward defense lawyers in general, and it would be difficult to construe this as a "highly derogatory remark" toward Taylor's counsel in particular. The trial court considered the objections, instructed counsel to stay within the record and overruled motions for a mistrial. Implicit in the trial court's ruling was a finding that any problem with the prosecutor's statements *1270 was harmless, and not of the level to support a motion for mistrial.
Examples of cases in which this Court has held clearly improper arguments were made are distinguishable from those of the present case: Bridgeforth v. State, 498 So.2d 796 (Miss. 1986) (defendant referred to as "scum"); Ellis v. State, 254 So.2d 902 (Miss. 1971) (defendant termed "professional criminal").
In Dunaway v. State, 551 So.2d 162 (Miss. 1989), this Court further noted:
As set forth in Craft v. State, 226 Miss. 426, 84 So.2d 531 (1956), the test to determine if an improper argument by a prosecutor requires reversal is whether the natural and probable effect of the prosecuting attorney's improper argument created unjust prejudice against the accused resulting in a decision influenced by prejudice.
Id. at 163.
Under this test, it does not appear there was reversible error in the case sub judice. Although finding the prosecutor's comments did contain "some cause for complaint," this Court stated in Dozier v. State, 257 So.2d 857, 860 (Miss. 1972):
This is regrettable and is by no means approved by this Court. However, in the context of the whole record, we are unable to say that any or all of these things were of such a character or of such substance as to have been capable of prejudicing the right of appellant to a fair trial.
Further, we note that the prosecutor was not perfect and made comments that were unfortunate, but the comments did not amount to reversible error. Appellate courts often recognize society as imperfect while at the same time attempting to hold prosecutors to absolute perfection. We affirm on this issue.

VII. CIRCUMSTANTIAL INSTRUCTION
Circumstantial evidence instructions which have been approved by this Court instruct the jury that it must not only find the accused guilty beyond a reasonable doubt, but it must also find the accused guilty "to the exclusion of every reasonable hypothesis other than guilt." Stringfellow v. State, 595 So.2d 1320, 1322 (Miss. 1992). The Court in Stringfellow declined to abolish the requirement of the language of the circumstantial evidence instruction although recognizing that the "beyond a reasonable doubt standard is no less stringent."
Taylor claims the trial court committed reversible error when it denied two circumstantial evidence instructions, citing Simpson v. State, 553 So.2d 37 (Miss. 1989). Simpson held that "circumstantial evidence instructions are required when the prosecution is without a confession and without eyewitnesses to the gravamen of the offense charged." Id. at 39. In the present case, Taylor confessed to Josephine Magee that he killed his stepdaughter. That confession takes the case out of a circumstantial context. In Mack v. State, 481 So.2d 793 (Miss. 1985), this Court held that an admission by a defendant to his girlfriend of an alleged burglary was a "confession," and constituted direct evidence of the crime such that giving a circumstantial evidence instruction was not required. Id. at 795. See also Anderson v. State, 246 Miss. 821, 828, 152 So.2d 702 (1963). Taylor's alleged confession to Josephine Magee makes a circumstantial evidence instruction inapplicable.

VIII. GRUESOME PHOTOGRAPHS
The photographs that were objected to were color photographs taken from relatively close range, showing the position of the body on the rear floorboard with the victim's left leg stretched on top of the back seat. As a general rule, the admissibility of photographs rests within the sound discretion of the trial judge. Unless abuse of discretion is shown, the trial judge's decision will be upheld on appeal. Ladner, 584 So.2d at 753-54; Mackbee v. State, 575 So.2d 16, 31 (Miss. 1990). "Photographs of bodies may be admitted into evidence where they are not so gruesome as to be overly prejudicial and inflammatory." Stringer v. State, 500 So.2d 928, 934 (Miss. 1986).
This Court has held photographs to be so gruesome and inflammatory as to be inadmissible in only one circumstance, a close-up photograph of a partly decomposed, maggot-infested *1271 skull. See McNeal v. State, 551 So.2d 151 (Miss. 1989). The photographs in the present case, although not pleasant, do not rise to the level of those found in McNeal.

IX. PRESERVATION OF EVIDENCE
Taylor contends that the State improperly failed to preserve the victim's car and the x-rays taken prior to the victim's autopsy. He argues that these pieces of evidence could have been exculpatory in nature as well as being vital in shedding more light into Mildred Spires' cause of death.
The landmark case concerning the preservation of evidence is California v. Trombetta, 467 U.S. 479, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984), which held that due process does not require that law enforcement officers preserve breath samples in order to introduce breath analysis tests at trial. Id. at 491, 104 S.Ct. at 2535, 81 L.Ed.2d at 423. In reaching this conclusion, the United States Supreme Court held that the State's duty to preserve evidence is "limited to evidence that might be expected to play a significant role in the suspect's defense." Id. at 488, 104 S.Ct. at 2534, 81 L.Ed.2d at 422. "Significant role" means that the exculpatory nature and value of the evidence must have been: (1) apparent before the evidence was destroyed; and (2) of such a nature that the defendant could not obtain comparable evidence by other reasonable means. Id. at 489, 104 S.Ct. at 2534, 81 L.Ed.2d at 422.
This Court adopted the Trombetta standard when it decided Tolbert v. State, 511 So.2d 1368 (Miss. 1987), cert. denied, 484 U.S. 1016, 108 S.Ct. 723, 98 L.Ed.2d 672 (1988). In Tolbert, the Court held that the State's failure to preserve a particle of skin clipped from an abrasion on the defendant's finger which he claimed would exonerate him did not require a dismissal of his indictment. "The mere possibility the evidence might aid the defense does not satisfy the constitutional materiality standard." Tolbert, 511 So.2d at 1372 (citing United States v. Binker, 795 F.2d 1218, 1230 (5th Cir.1986), cert. denied, 479 U.S. 1085, 107 S.Ct. 1287, 94 L.Ed.2d 144 (1987)). Finally, the destruction of the evidence must not have been done in bad faith. Tolbert, 511 So.2d at 1372 (citing United States v. Webster, 750 F.2d 307, 333 (5th Cir.1984), cert. denied, 471 U.S. 1106, 105 S.Ct. 2340, 85 L.Ed.2d 855 (1985)). If the destruction of evidence was done as a matter of routine and with no fraudulent intent, there is no inference of bad faith. Washington v. State, 478 So.2d 1028, 1032 (Miss. 1985).
There was no showing of bad faith on the part of the State in the present case. There were photographs of the car which showed the location and condition of the vehicle. In accordance with usual police procedure, the car remained in police custody for approximately a month and a half before it was released to the victim's family. In viewing the photographs, no exculpatory evidence appears to be present. The x-rays, on the other hand, were taken prior to the autopsy in order to search for foreign objects as well as broken bones. When the x-rays did not reveal either foreign objects or broken bones, they were thrown away. Finally, the mere possibility that the car or the x-rays would show some exculpatory evidence is not enough to meet the Trombetta standard.

X. INTRODUCTION OF ADMISSIONS BY TAYLOR
Taylor contends that it was error for the trial court to deny his motion for a directed verdict because the prosecution introduced inculpatory statements which he had made to Beatrice Young before the prosecution had proved corpus delicti. Taylor cites Burkhalter v. State, 302 So.2d 503, 504-05 (Miss. 1974), for the "general rule that the prosecution should first submit evidence tending to prove the corpus delicti before introducing into evidence the confession made by an accused person." That case goes on to say, however, that "the rule is not without some flexibility as to the order of proof in conjunction with confessions and independent proof of corpus delicti." Id. The Court in Burkhalter found no error in admitting the defendant's confession prior to admitting a stipulation on cause of death. Id. at 505. The Court emphasized not the order of proof but the rule that "the state must establish corpus delicti aliunde an out of court confession of *1272 the crime with which the accused is charged" and must present sufficient evidence to establish "that a real and not an imaginary crime has been confessed." Id. at 505, citing Brooks v. State, 178 Miss. 575, 173 So. 409 (1937). See also Miskelley v. State, 480 So.2d 1104, 1107-08 (Miss. 1985); Poole v. State, 246 Miss. 442, 150 So.2d 429 (1963). In these cases it is not the order of proof which is crucial but the rule that a confession may not be treated as sufficient to establish the corpus delicti.
The corpus delicti in a capital murder case consists of (1) the death of the victim, and (2) the existence of criminal agency as the cause of death. Shell v. State, 554 So.2d 887, 901 (Miss. 1989), cert. granted and rev'd in part, 498 U.S. 1, 111 S.Ct. 313, 112 L.Ed.2d 1 (1990), on remand, 595 So.2d 1323 (Miss. 1992). Medical evidence is not required to prove either element of corpus delicti. Miskelley, 480 So.2d at 1107; King v. State, 251 Miss. 161, 176, 168 So.2d 637, 643 (1964).
The "admissions" of which Taylor complains here are statements which he made to Beatrice Young. The statements made to Young were inculpatory but did not constitute an admission of guilt; in fact, Young testified that Taylor denied having killed Mildred. At the time that Young's testimony was elicited, the State, through the testimony of Melissa Spires and Edith Taylor, had shown that Mildred Spires had left home under unusual circumstances, that Mildred was dead, and that the family had identified the clothing and objects found on the body as the same items which Mildred was wearing when she disappeared. There was no error in admitting Taylor's statements to Beatrice Young.

Penalty Phase
Over defense objection, the trial court granted the State's motion to incorporate by reference all of the testimony, physical evidence, and other matters presented to the court and jury during the guilt phase and instructed the jury that it could consider all evidence previously heard in the trial. The State also offered a two count indictment of Taylor for aggravated assault and burglary of an occupied dwelling and the sentencing order which followed conviction on the aggravated assault charge. The sentencing order was admitted into evidence and the State rested. Taylor adduced testimony from his sister, Zennie Mae Jefferson; from Father Peter Mockler, who had visited Taylor in the Hancock County jail; from Charles McNair, the man who had conducted Bible study in the Hinds County jail where Taylor had been housed; and from Taylor's son, Roderick Taylor. The evidence showed that Taylor had finished only the third grade but that he had developed a lot of skills at "fixing things." His sister told of some kindnesses that Taylor had bestowed on elderly neighbors and a handicapped child when he was a child. There was no evidence that Taylor was mentally or physically incompetent.

XI. SENTENCING
Taylor claims that the lower court committed reversible error when it did not conduct an habitual offender hearing prior to sentencing. The effect of this failure was that the jury was not aware that, as an habitual offender, Taylor could be sentenced to life imprisonment without the possibility of parole. In support of this position, Taylor relies on Turner v. State, 573 So.2d 657 (Miss. 1990), cert. denied, 500 U.S. 910, 111 S.Ct. 1695, 114 L.Ed.2d 89 (1991), which held that the constitutional principles of due process and fundamental fairness require that the jury must have before it as much information as possible when making its sentencing decision. Id. at 674. In Mackbee, this Court held:
When the State placed the prior sentence before the jury, without an instruction fully explaining the potential current legal consequences of such a sentence, it had the further detrimental effect of erroneously implying to the jurors that [defendant] could get out on probation, or parole, if given a life sentence. The jury logically could think that since [defendant] got out on probation for his prior conviction, he would get out on parole if given a life sentence. *1273 Mackbee, 575 So.2d at 39-40. Had the jury in the present case been informed that Taylor, as an habitual offender, would not have the opportunity for parole, they might have opted for life imprisonment rather than imposing the death penalty. This alternative might have been seized by several jurors who indicated during voir dire that they were dissatisfied with the justice system for sentencing criminals "for life," only for them to be let back on the streets within a few years.
The State claims that Turner is inapplicable, because Taylor was sentenced to death five months before Turner was handed down. The State argues that Turner should be applied prospectively, rather than retroactively. In Turner, this Court stated:
Accordingly, this Court directs that in future cases the status phase must be conducted prior to the sentencing phase. At the sentencing phase, the jury shall be entitled to know by instruction whether the defendant is eligible for parole.
Turner, 573 So.2d at 675 (citations omitted). Subsequent cases, in which the death penalty was imposed pre-Turner but appeals were heard post-Turner, have applied the Turner mandate, reversing and remanding for re-sentencing because the jury sentenced the defendant to death prior to an habitual offender determination. See Russell v. State, 607 So.2d 1107, 1118 (Miss. 1992); Ladner, 584 So.2d at 758-59; Mackbee, 575 So.2d at 38-41; Berry v. State, 575 So.2d 1, 13-14 (Miss. 1990), cert. denied, 500 U.S. 928, 111 S.Ct. 2042, 114 L.Ed.2d 126 (1991). Despite the apparent reference to prospective application, in every case since Turner, where the trial court failed to conduct the habitual offender determination prior to the jury's imposition of the death sentence, this Court has applied the Turner mandate, reversing and remanding for re-sentencing. Taylor must be accorded the same status as those other cases in this category, commencing with Turner and continuing thereafter.
The remedy for failure to conduct the status hearing prior to the sentencing phase and failure to properly instruct the jury on the meaning of life imprisonment is to vacate the death sentence and remand for new sentencing trial with proper instructions. Turner, 573 So.2d at 675; Mackbee, 575 So.2d at 41; Ladner, 584 So.2d at 759. Had the jury been aware of Taylor's habitual offender status, they might have opted for a life sentence. This, as in Mackbee, is especially true since Taylor's jury was aware that he was on parole from a prior life sentence.
The lower court committed reversible error when it did not conduct an habitual offender hearing prior to sentencing. This reason necessitates reversal and remand for resentencing.

XII. COURT'S INSTRUCTION REGARDING AGGRAVATING FACTORS
After the end of evidence in the penalty phase, the jury was given instructions which included S-1. That instruction provided inter alia:
() Whether the capital murder was committed by a person under sentence of imprisonment, as more fully defined in other instructions of the Court.
() Whether the defendant was previously convicted of another capital offense or of a felony involving the use or threat of violence to the person.
() Whether the capital murder was committed intentionally while the defendant was engaged in the commission of kidnapping or flight after committing kidnapping.
() Whether the capital murder was committed for the purpose of avoiding or preventing the detection and lawful arrest of the defendant.
() Whether the capital murder was especially heinous, atrocious or cruel, as defined in other instructions of the Court.
... .
The verdict you return must be written on a separate sheet of paper signed by the foreman. Your verdict should be written in one of the following forms:
(1) "We, the Jury, unanimously find from the evidence, beyond a reasonable doubt, that the following facts existed at the time of the commission of the capital murder: (List or itemize all facts found, if any, from the list under Section A [Enmund factors] of this instruction *1274 which you unanimously agree exist in this case, beyond a reasonable doubt). Next, we, the Jury, unanimously find that the aggravating circumstance(s) of: (List or itemize all of the aggravating circumstance(s) presented in Section B of this instruction which you unanimously agree exist in this case, beyond a reasonable doubt) is/are sufficient to impose the death penalty and that there are insufficient penalty and that there are insufficient mitigating circumstances to outweigh the aggravating circumstance(s), and we unanimously find the defendant should suffer death."
The jury returned a verdict in less than an hour and after the trial court reviewed the verdict, he addressed the jury as follows:
I understand the form of your verdict, but I am not sure that it reads completely as the Court would require to clearly establish your finding in the second, Part B of the instruction. If it is the decision of the jury, then the "whether" should be changed to the form that the jury finds "that there is." You will need to return to the jury room and remove the word "whether" and make the instruction state where "there is," so that it will be clear that you are making those findings. If you will give them this and let's return to the jury room.
The defense counsel objected to the trial court's oral instruction. The jury returned a verdict indicating that they had found all five aggravating circumstances. The jury was polled and each agreed that he or she agreed with the verdict.
Taylor contends that the oral instruction amounted to a direction to the jury to find aggravating circumstances and he cites Owens v. State, 82 Miss. 18, 33 So. 718 (1903), in support of his contention that the Court's action compels vacation of his sentence. In Owens, this Court, reversing the case because the jury had not truly agreed on a verdict, gave the following instructions:
[W]here there are words in the verdict raising an `apparent cloud' as to what the actual intent of the jury is, the court, whether asked or not, should `dispel that cloud,' and have the jury make plain their meaning. And the court, of course, had the amplest power to do this, and, if necessary, to send them back to the jury room to render a clear and unambiguous verdict; and most especially should this ample power be exercised in a capital case.
... .
... It would have been perfectly proper for [the trial judge] to have taken from the charges for the state the one as to the form of their verdict and directed the jury to retire, read the charge, and put their verdict in form.
Owens, 82 Miss. at 26-29, 33 So. at 720-21 (quoting Smith v. State, 75 Miss. 542, 558, 23 So. 260, 266 (1898)). See also Miss.Unif. R.Cir.Ct.Prac. 5.14 (if a verdict is so defective that it is not possible to determine the intent of the jurors, the judge shall direct the jurors to reconsider the verdict).
Here, the only question is that of whether or not the trial judge in his oral instruction to the jury said anything which would taint the verdict. Because the jury had with them the instruction S-1, and because the court directed them to re-form the verdict "if it is the decision of the jury," there was no error.

XIII. VALIDITY OF AGGRAVATING FACTORS
Taylor's challenge to each of the aggravating circumstances is addressed individually.
(1) Under Sentence of Imprisonment. Taylor contends that the evidence that he was under a sentence of imprisonment was insufficient to support a finding of the aggravating circumstance that he was "under a sentence of imprisonment." Having found that the evidence was sufficient to prove the element of the crime that Taylor was "under a sentence of life," we hold that it was legally sufficient to support the finding of an aggravating circumstance.
(2) Previously Convicted of a Felony Involving the Use or Threat of Violence. Taylor claims the prior murder conviction was insufficient to support this aggravating factor and claims that the conviction of aggravated assault (dated April 14, 1989) was insufficient because it occurred after the crime for which he was being sentenced. *1275 This Court has held that convictions subsequent to the crime for which a person is being sentenced may be used as proof of aggravating circumstances. Turner, 573 So.2d at 670; Leatherwood v. State, 435 So.2d 645, 651-52 (Miss. 1983), cert. denied 465 U.S. 1084, 104 S.Ct. 1455, 79 L.Ed.2d 772 (1984); Jones v. State, 381 So.2d 983, 994 (Miss. 1980), cert. denied, 449 U.S. 1003, 101 S.Ct. 543, 66 L.Ed.2d 300 (1980); Reddix v. State 381 So.2d 999 (Miss. 1980), cert. denied, 449 U.S. 986, 101 S.Ct. 408, 66 L.Ed.2d 251 (1980). The jury did not err in finding this aggravating factor.
(3) While Engaged in the Commission of Kidnapping or Flight after Committing Kidnapping. Taylor contends that there was no evidence that the murder was committed intentionally while the defendant was engaged in the commission of a kidnapping or flight after committing a kidnapping, and that therefore, no rational trier of fact could have been convinced beyond a reasonable doubt of the existence of this aggravating factor.
The State maintains that the prosecution adduced evidence from which the jury could have found that Taylor murdered Mildred Spires while engaged in the commission of a kidnapping. The State says in its brief:
That she did not want to be in the car with Taylor is evidenced by the signs of violence in the car: a torn brassiere, half of which was found in the front seat of the car and half of which was found on her body; a broken ash tray; and, a stuffed heart pillow torn from the [rearview] mirror. That Taylor prevented her from leaving is also evidenced by the car: her car keys and the gold chain she wore around her neck were found underneath the back seat.
The above evidence is sufficient to support a finding, beyond a reasonable doubt, that through trickery and deceit Taylor caused Mildred Spires to meet him and that he then confined her in her own car and, when she wanted to leave, used violence to prevent her from leaving a place she did not want to be. This is ample proof to support the jury's finding of this aggravating circumstance.
Because the car in which Mildred's body was found was not located for some months after her disappearance and because the windows were open when the car was found, it is not possible to say with certainty that the conditions existing in the car were caused, as the State contends, by Taylor's actions in holding Mildred against her will. Because we do not think the State's evidence was sufficient for the jury to find beyond a reasonable doubt that Taylor kidnaped Mildred, the presentation of this factor to the jury was error.
(4) Avoiding or Preventing a Lawful Arrest. Taylor claims that the State adduced no evidence to support the proposition that the murder was committed for the purpose of avoiding or preventing the detection and lawful arrest of the defendant. The Court has said that the "avoiding arrest" aggravating circumstance is justified where:
there is evidence from which it may be reasonably inferred that a substantial reason for the killing was to conceal the identity of the killer or killers or to `cover their tracks' so as to avoid apprehension and eventual arrest by authorities.
There is absolutely no evidence that a desire to avoid apprehension and arrest was a substantial reason for the killing of Mildred Spires. This instruction was improperly given to the jury as an aggravating circumstance.
(5) Especially Heinous, Atrocious or Cruel. Taylor maintains that the State adduced no evidence that the capital murder was especially heinous, atrocious or cruel. The State contends that there was sufficient evidence that Mildred Spires died of strangulation and that strangulation is "unnecessarily torturous to the victim." The State bases its contention on the testimony of Dr. Galvez who testified that "strangulation ... is a slow way to kill anybody." Galvez said of strangulation: "There is pain in the neck. I am sure that at least once in a while, you hit your Adam's apple, and you feel pain, physical pain."
The legislative language of this aggravating factor has been found to be unconstitutionally vague. Clemons v. State, 535 *1276 So.2d 1354, 1361 (Miss. 1988) (citing Maynard v. Cartwright, 486 U.S. 356, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988)) vacated on other grounds, 494 U.S. 738, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1989). The aggravating circumstance may be used only when the jury is instructed as to its meaning in a manner which will channel the jury's discretion in sentencing. This Court has held that this language refers to "those situations where the actual commission of the capital felony was accomplished by such additional acts to set the crime apart from the norm of capital felonies by the consciencelessness or pitilessness of the crime which is unnecessarily tortuous to the victim." Hansen v. State, 592 So.2d 114, 151 (Miss. 1991) cert. denied, 504 U.S. 921, 112 S.Ct. 1970, 118 L.Ed.2d 570 (1992) (emphasis added).
There was no evidence before the jury as to how the crime was actually committed. Even if Dr. Galvez's opinion as to strangulation is accepted as true, there is no evidence of how the strangulation was carried out and no evidence of any "additional acts" to set the crime apart from the norm of capital felonies as conscienceless, pitiless or unnecessarily torturous. This aggravating circumstance was improperly submitted to the jury.
This Court has said that it will not re-weigh aggravating and mitigating circumstances on appeal; such weighing is a matter solely for the jury. Clemons v. State, 593 So.2d 1004, 1006 (Miss. 1992). The present case, however, is distinguished from our prior cases in which we have refused to re-weigh aggravating and mitigating factors. It is also distinguished from any supposed vagueness under the United States Supreme Court holdings or definitions. This case simply lacks the requisite proof or evidence to support the jury's finding of three aggravating factors. The State showed only conjecture, not evidence, that a kidnapping had occurred. Likewise, there was no evidence other than the prosecution's argument which would support a finding that the murder was committed for the purpose of avoiding or preventing the detection and lawful arrest of the defendant. Finally, we are left solely with speculation that the victim's death was especially heinous, atrocious and cruel. These important distinguishing characteristics are not based on semantic subtleties, but on an absence of proof and evidence which could substantiate the jury's finding of three aggravating factors. We cannot re-weigh the aggravating and mitigating factors not because of our past precedent, but more importantly, because there is a lack of proof and evidence to support a re-weighing. Therefore, the judge committed reversible error when he instructed the jury as to the aggravating factors.

XIV. JURY INSTRUCTIONS
Taylor claims that jury instruction S-1 should not have been given, since it had numerous flaws. First, Taylor claims that the instruction allowed the prosecution to "double up" by allowing the jury to consider as aggravating circumstances whether the murder was committed by a person under sentence of imprisonment as well as whether he was previously convicted of another capital offense or felony involving the use or threat of violence to the person. However, the language of the instruction was taken directly from Miss. Code Ann. § 99-19-101(5)(a) & (b), which lists the aggravating circumstances to be considered. Factor 5(a), "under sentence of imprisonment," requires a finding of present sentence while factor 5(b) requires a finding of a conviction of a felony involving violence. The State offered Taylor's sentence of life imprisonment for a prior murder to support a finding of factor 5(a), while the prior convictions for murder and aggravated assault were offered to support factor 5(b).
Next, Taylor claims that instruction S-1 was flawed because once the jury found at least one aggravating factor, the instruction shifted the burden of proof to Taylor to prove that a life sentence was warranted. We have rejected this argument in the past, and again reject it in this case. See Shell v. State, 554 So.2d at 904 (Miss. 1989). See also Jordan v. State, 365 So.2d 1198, 1206 (Miss. 1978), cert. denied, 444 U.S. 885, 100 S.Ct. 175, 62 L.Ed.2d 114 (1979).
Taylor's third complaint about instruction S-1 is that the lower court failed to include all of the mitigating circumstances *1277 which the defense submitted. When the mitigating factors of instruction S-1 are compared to the mitigating factors in § 99-19-101(6), only "the age of the defendant" was not included in the jury instruction, and this factor would fall under the "catch-all" mitigating circumstance. The exact "catch-all" language has been approved by this Court in Gray v. State, 375 So.2d 994, 1004 (Miss. 1979), cert. denied, 446 U.S. 988, 100 S.Ct. 2975, 64 L.Ed.2d 847 (1980). See also Boyde v. California, 494 U.S. 370, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990).
The final problem Taylor has with jury instruction S-1 is that it failed to require the State to prove beyond a reasonable doubt that there were insufficient mitigating circumstances to outweigh the aggravating circumstances and that the death penalty was the appropriate punishment. However, in Wiley v. State, 484 So.2d 339 (Miss. 1986), cert. denied, 479 U.S. 906, 107 S.Ct. 304, 93 L.Ed.2d 278 (1986), overruled on other grounds, Willie v. State, 585 So.2d 660, 681 (Miss. 1991), this Court addressed this exact issue, stating:
The majority rule of this Court is that the jurors are required to find the existence of each aggravating circumstance beyond a reasonable doubt, but the jury is not required to find that the aggravating circumstances beyond a reasonable doubt outweigh the mitigating circumstances following the statute.
Wiley, 484 So.2d at 352 (emphasis added). This issue is resolved in favor of the State.
Lastly, Taylor claims that the trial court erred in refusing to grant jury instruction D-14, a residual doubt instruction. We have addressed whimsical or residual doubt instructions and have found no such instructions are required as a mitigating circumstance. Hansen, 592 So.2d at 150-51; See also Minnick v. State, 551 So.2d 77, 95 (Miss. 1988), reversed and remanded on other grounds, 498 U.S. 146, 111 S.Ct. 486, 112 L.Ed.2d 489 (1990), overruled on other grounds, Willie v. State, 585 So.2d 660, 681 (Miss. 1991).

CONCLUSION
After a thorough and exhaustive review, we conclude that no error occurred during the guilt phase of Taylor's trial. Therefore, Taylor's conviction of capital murder is affirmed.
As to the sentencing phase of the trial, the record clearly indicates that the trial court failed to conduct a habitual offender hearing in order to apprise the jury of Taylor's habitual offender status. This was especially important due to the fact that Taylor's jury was aware that he was on parole from a prior life sentence. Therefore, Taylor's sentence is hereby vacated and we remand for resentencing.
CONVICTION OF CAPITAL MURDER AFFIRMED.
DAN M. LEE, C.J., specially concurs with separate written opinion.
PRATHER, P.J., concurs in part and dissents in part with separate written opinion; as to part I, SMITH, J., joins this opinion in part.
SULLIVAN, P.J., concurs in part and dissents in part with separate written opinion joined by BANKS, J.
SMITH, J., concurs in part and dissents in part with separate written opinion joined by JAMES L. ROBERTS, Jr., J.
McRAE and MILLS, JJ., not participating.
SENTENCE OF DEATH VACATED; REMANDED FOR RESENTENCING.
DAN M. LEE, C.J., specially concurs with separate written opinion.
PRATHER, P.J., concurs in part and dissents in part with separate written opinion; as to part I, SMITH, J., joins this opinion in part.
SULLIVAN, P.J., concurs in part and dissents in part with separate written opinion joined by BANKS, J.
*1278 SMITH, J., concurs in part and dissents in part with separate written opinion joined by JAMES L. ROBERTS, Jr., J.
McRAE and MILLS, JJ., not participating.
DAN M. LEE, Chief Justice, specially concurring:
I concur with the majority opinion and write separately because I believe that the evidence produced at trial was insufficient to establish the existence of the "especially heinous, atrocious or cruel" statutory aggravator. It is my belief that this Court can apply harmless error analysis to cases in which the facts adduced at trial support the "especially heinous, atrocious or cruel" aggravator.
In a homicide trial, before the jury can impose the death penalty upon the defendant, the jury must convict the defendant of murder and find at least one "aggravator." Zant v. Stephens, 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983); Nixon v. State, 533 So.2d 1078, 1099 (Miss. 1987), cert. denied, 490 U.S. 1102, 109 S.Ct. 2458, 104 L.Ed.2d 1012 (1989), and reh'g denied, 492 U.S. 932, 110 S.Ct. 13, 106 L.Ed.2d 628 (1989). As the United States Supreme Court has explained, the aggravating circumstance must meet two requirements. First, the circumstance may not apply to every murder; it must apply only to a statutorily defined class of defendants convicted of murder. Arave v. Creech, 507 U.S. 463, 474, 113 S.Ct. 1534, 1542, 123 L.Ed 2d 188, 200 (1993) ("If the sentencer fairly could conclude that an aggravating circumstance applies to every defendant eligible for the death penalty, the circumstance is constitutionally infirm"); see also Lewis v. Jeffers, 497 U.S. 764, 110 S.Ct. 3092, 111 L.Ed.2d 606 (1990). Second, the "aggravator" must not be unconstitutionally vague. Godfrey v. Georgia, 446 U.S. 420, 428, 100 S.Ct. 1759, 1764-65, 64 L.Ed.2d 398 (1980).
This Court has struggled long and hard over the "especially heinous, atrocious or cruel" statutory aggravator that the United States Supreme Court in Clemons v. Mississippi, 494 U.S. 738, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990), found to be unconstitutionally vague without appropriate limiting language. It is now well known that the United States Supreme Court told the State of Mississippi that it had three options when confronted with a case in which a jury sentenced the defendant to death after it was given the "especially heinous, atrocious or cruel" aggravator without also being instructed on the proper limiting language. Clemons, supra. The Court said that Mississippi could: (1) reweigh the remaining aggravators; (2) apply harmless error analysis; or (3) remand the case to the circuit court for a new trial as to the penalty phase. Clemons, supra. It is my belief that this Court can engage in "harmless error" analysis in specific cases, where the operative facts of the case support the "especially heinous, atrocious or cruel" aggravator. See Irving v. State, 618 So.2d 58, 63-64 (Miss. 1992).
Having said that, in the case sub judice, it is my belief that there was absolutely no evidence to support the jury's finding of the "especially heinous, atrocious or cruel" aggravator. Mildred Spires' decomposed body was found nearly two months after her disappearance and there was no eyewitness testimony or any other type of testimony to indicate that Ms. Spires' murder was "especially heinous, atrocious or cruel." From the facts before this Court, we cannot even be sure that Ms. Spires was conscious or aware of her impending death at the time she was murdered. Therefore, in the case sub judice, when we consider the facts and circumstances of the crime, it is apparent that there was no support in the record for the "especially heinous, atrocious or cruel" aggravator.
Accordingly, I concur and would remand this case back to the circuit court for a new trial as to the penalty phase.
PRATHER, Presiding Justice, concurring in part and dissenting in part:
I concur with the majority opinion in affirmance of the conviction of C.W. Taylor for capital murder, and I concur with the result only of the majority's holding in the sentencing phase. However, I do not agree with all grounds for reversal of sentencing or in the total analysis.

*1279 I.
At the conclusion of the sentencing hearing, the trial judge submitted by instruction several aggravating factors, inter alia, for the jury's consideration:
(1) The capital offense was committed while the defendant was engaged ... in the commission of, or an attempt to commit, or flight after committing or attempting to commit, any ... kidnaping ...
(2) The capital offense was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody.
Miss. Code Ann. § 99-19-101(5) (Rev. 1994).
Of those aggravators submitted, the majority holds that the first factor above, (the capital offense was committed while engaged in the commission of kidnaping), and the second factor above, (the offense was committed for the purpose of avoiding or preventing a lawful arrest), lacked an evidentiary basis for submission to the jury. However, it is my view that the first factor above (the capital offense was committed while engaged in commission of a kidnaping) has an evidentiary basis. The torn clothing and jewelry of the victim, and the disarray of the interior of the car evidences a struggle. From these evidentiary facts, a reasonable inference can be drawn that the victim was held against her will. I therefore disagree with the majority view that the submission of this aggravating circumstance was error. In my view it was not.
However, the evidentiary basis for avoiding or preventing a lawful arrest is without any testimony. The timing of the actions of a person's spray painting the victim's automobile is not in evidence. To be an aggravating factor, Miss.Code Ann § 99-19-101(5)(e) states:
The capital offense was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody.
For this factor to apply, the act of avoiding or preventing an arrest or escaping had to have occurred when the murder was committed, and it must have been a motivating factor in the killing. The dissent suggests that the spraying of the car was such an act, but has no evidentiary basis for the time of the action. Assuming that the defendant was the actor, the dissent suggests that the spray painting occurred after Taylor was told by Detective Knowles that fingerprints would be found on the car. It is my view that the above statutory language requires that the actual killing be done in avoidance of the arrest. A later act to avoid arrest does not meet the statutory requirement for this aggravating factor. The record here is without substantiation on this factor; therefore, there is error in this sentencing hearing on this point and that error requires a new hearing. I therefore concur with the majority in its reversal of the sentencing phase on incorrect submission of factor two above.

II.
The last issue is whether this defendant was entitled to have an habitual offender hearing prior to his sentencing hearing under Turner v. State, 573 So.2d 657 (Miss. 1990). The issue does not have to be addressed as a new sentencing hearing is required because of reversible error. Russell v. State, 607 So.2d 1107, 1118-19 (Miss. 1990); Mackbee v. State, 575 So.2d 16, 38-41; Berry v. State, 575 So.2d 1, 14 (Miss. 1990). On remand, the trial court should be directed to conduct an habitual offender hearing prior to the resentencing hearing and to follow the mandate of Turner on instructing the sentencing jury.
As to part I, SMITH, J., joins this opinion in part.
SULLIVAN, Presiding Justice, concurring in part and dissenting in part:
I concur that this case must be reversed on sentence but I dissent to the majority's affirmance of the guilt phase.
Taylor claims that the lower court erred in overruling his motion for mistrial when the prosecutor, during closing argument, indirectly commented on his failure to testify in violation of the Fifth Amendment. Josephine Magee testified on direct examination that Taylor admitted killing Mildred Spires. When defense counsel questioned Magee about the alleged admission on cross-examination, *1280 she responded, "Well there C.W. is. Ask him didn't he tell me this."
The prosecutor referred to Magee's statement in his closing argument:
As Josephine sat up right here and said, "He's just like my brother, but let me tell you this: If he didn't tell me that, you ask him, because I'm sitting right here and I'm looking him right in the eye and I'm telling you he told me he killed that girl, and if you don't believe it, ask him."
Taylor immediately objected and requested a mistrial, but the trial judge overruled the motion.
The question before this Court is whether or not the prosecutor's comment can reasonably be construed as a comment on Taylor's failure to testify. Ladner v. State, 584 So.2d 743, 754 (Miss. 1991), cert. denied, 502 U.S. 1015, 112 S.Ct. 663, 116 L.Ed.2d 754 (1991). "Direct comment on a defendant's failure to testify is constitutionally impermissible and constitutes error." Id; Griffin v. State, 557 So.2d 542, 552 (Miss. 1990); Shook v. State, 552 So.2d 841, 851 (Miss. 1989). "Prosecutors are also forbidden from referring to a defendant's failure to testify `by innuendo and insinuation.'" Jimpson v. State, 532 So.2d 985, 991 (Miss. 1988) (quoting Wilson v. State, 433 So.2d 1142, 1146 (Miss. 1983)). In determining if error was committed, this Court must look to the facts and circumstances of each case. Ladner, 584 So.2d at 754.
On cross-examination, Magee challenged Taylor to refute her testimony. Although the prosecutor did not elicit this testimony, he commented on it during closing argument. It is evident that the prosecutor's comment "insinuated" to the jury that Taylor did not testify because he could not refute Magee's testimony.
This case is similar to Butler v. State, 608 So.2d 314 (Miss. 1992). In Butler, the defendant did not testify, but her statements to law enforcement officers were admitted into evidence.
In the course of closing argument, the prosecution made several jabs around the perimeter of commenting upon Butler's failure to testify. What clearly amounted to comments on her failure to testify, however, were the following:
Ladies and Gentlemen, that is an admission of guilt, but I submit to you she hasn't told you the whole truth yet.
... .
Ladies and Gentlemen, those bruises were not inflicted by the same wound that created the massive internal injuries that subsequently killed this child. It could not have happened. So, Ladies and Gentlemen, she has not yet told you the whole truth of the torment she subjected her son to. You still don't know the whole story. Incredible, unbelievable evasion from start to finish. Ladies and Gentlemen, is that what an innocent person does?
Objections to these comments were overruled.
Butler, 608 So.2d at 318.
In determining that the prosecutor violated Butler's Fifth Amendment rights, this Court held:
It was competent for the district attorney to comment on the weight and worth of what was in evidence, but he also had the duty to carefully, very carefully refrain from making any remark which directly or by insinuation focused the jurors' attention or alerted them to the fact that Butler did not take the stand....
... .
The only living witness, of course, to the infant's death was Butler. She was the only person who could tell what had happened. As noted, the prosecuting attorney could have very properly evaluated the weight and worth of the statements she had given the law enforcement officers, so long as there was no suggestion about her failure to testify. Shook v. State, 552 So.2d 841, 851 (Miss. 1989); Alexander v. State, 520 So.2d 127, 130 (Miss. 1988).
When he added, however, that Butler "hasn't told you the whole truth yet," there was no escaping a wonder in the jurors' minds that there was more to come if she had taken the witness stand. He proceeded to exacerbate an already reversible error by adding, "you still don't know the whole story." Who was the only person *1281 alive who could give "the whole story?" Butler.
The prosecution could hardly have made the point plainer if it had simply come out and said, "There is a lot more to tell, but Butler has not seen fit to get on the witness stand and tell you."
These comments were reversible error, so egregious in fact that even if there had been no objection at trial, we would nevertheless have been obligated to reverse. [Livingston v. State, 525 So.2d 1300, 1305-08 (Miss. 1988)].
Id. at 318-19 (emphasis added) (citations omitted).
Likewise, in this case, it was proper for the prosecutor to comment on Magee's testimony that Taylor admitted to killing Mildred Spires, but he went too far when he commented on her unelicited statement, "Ask him didn't he tell me this." This was not evidence, and it was not worthy of comment. Furthermore, it was not a comment on the lack or inadequacy of a defense. Shook, 552 So.2d at 851; Jimpson, 532 So.2d at 991. Its use could only have been to raise questions in the jurors' minds as to why Taylor did not take the stand and refute Magee's testimony.
The prosecutor's comment constitutes reversible error. Even the lower court's cautionary instructions, Instruction C-1 and Instruction C-9, could not cure this error.
The majority has made a strong case that the defense lawyer invited the comment by not objecting to the testimony he elicited. Counsel is castigated for this failure. Counsel did not invite or elicit the prosecutor's comment in argument and did object to it. Is the prosecutor held accountable for his error? NO. First we are told that at worst it is harmless, and second that the jury had ample evidence to convict anyway. That is exactly what makes the comment so egregious! It will not do to fall back on that old escape hatch in so-called "heightened scrutiny" cases and say "there is wide latitude in argument." It is true that is our law. What we have so often solemnly proclaimed amounts to telling lawyers we will carefully read records to see that evidentiary rules are followed and that the jury relies on that evidence to decide the case. BUT, you have wide latitude to do as you please in argument. If the jury, after hearing all the evidence, still needs the oration to reach a verdict, then I badly misjudge the quality of today's jurors.
There was a time when prosecutors would not flirt with such dangerous arguments. They did not because at the first such transgression the trial judge would promptly grant a mistrial, and if he did not, this Court would reverse him. Everyone knew it. Now, if the crime is serious enough, you can go for broke, reasonably certain you will not be checked by those guardians of fair play that occupy both tiers of benches in this state. Only the prosecution is allowed to commit harmless errors, even if that error is a constitutional violation. We have never demanded the State provide a perfect trial, but we do require a fair one.
I most respectfully regret that I cannot join the majority, either in reasoning or result on the issue of comment upon the failure to testify.
I would reverse as to guilt also.
BANKS, J., joins this opinion.
SMITH, Justice, concurring in part and dissenting in part:
I agree with the majority's affirmance of guilt. It is with the majority's decision to reverse on the jury's determination that Taylor should be sentenced to death that I find that I cannot agree.
The majority holds that the lower court committed reversible error when it did not conduct an habitual offender hearing prior to sentencing, relying on Turner v. State, 573 So.2d 657 (Miss. 1990), cert. denied, 500 U.S. 910, 111 S.Ct. 1695, 114 L.Ed.2d 89 (1991), and a series of subsequent decisions, for support of this position.
The State claimed Turner is inapplicable because Taylor was convicted and sentenced some five months before Turner was decided by this Court. Additionally, the State maintained that the facts of this case take it out of the realm of Turner, because an habitual offender hearing was never conducted in the case sub judice, hence no adjudication of *1282 Taylor as an habitual offender exists. The State also argued that Turner should be applied prospectively, rather than retroactively, primarily based on language within the opinion directing the holding on this issue to "future cases." Id. at 675. There appears to be merit and logic to the State's argument. However, in spite of the apparent reference to prospective application, in every case since Turner this Court has applied the Turner mandate, reversing and remanding for re-sentencing where the trial court failed to conduct the habitual offender determination prior to the jury's imposition of the death sentence. I disagree with the majority's position. The prospective language of Turner should be followed by this Court. Turner is inapplicable to this case. Taylor has never been adjudicated an habitual offender by the trial court. There is no merit to this issue raised by Taylor.
As to the remaining issues which the majority has held constitute reversible error in the guilt phase of Taylor's case, I again find myself at odds with the majority's position. The majority holds that there was insufficient evidence to support the giving of three of the aggravators to the jury for their consideration. In my opinion, there was sufficient evidence to support the giving of the three aggravating circumstances submitted to the jury. The majority incorrectly holds the jury was improperly instructed and that the proof was insufficient under this issue. Additionally, this case was tried utilizing the proper limiting instruction language approved in Hansen v. State, 592 So.2d 114, 151 (Miss. 1991), cert. denied, 504 U.S. 921, 112 S.Ct. 1970, 118 L.Ed.2d 570 (1992), as applicable to the "especially heinous, atrocious or cruel" aggravator. I would affirm the conviction and sentence, and am, therefore compelled to dissent.

XI. DID THE TRIAL COURT ERR IN REFUSING TO INFORM THE JURY PRIOR TO ITS SENTENCING DETERMINATION THAT DEFENDANT, AN HABITUAL OFFENDER, WOULD NOT BE ELIGIBLE FOR PAROLE?
The majority holds that Turner and every subsequent case thereafter concerning this issue, have been reversed for failure of the trial court to conduct an habitual offender hearing prior to sentencing by the jury. The majority maintains that had Taylor's jury been informed that Taylor, as an habitual offender, would not have the opportunity for parole, they might have opted for life imprisonment rather than imposing the death penalty.
It is certainly true that Turner held that the constitutional principles of due process and fundamental fairness require that the jury must have the status phase conducted prior to the sentencing phase in order that the jury know by instruction whether the defendant is eligible for parole. Id., 573 So.2d at 673-74.
However, the Turner Court clearly mandated that the decision should be applied prospectively, rather than retroactively. The Turner Court stated:
Accordingly, this Court directs that in future cases the status phase must be conducted prior to the sentencing phase. At the sentencing phase, the jury shall be entitled to know by instruction whether the defendant is eligible for parole.
573 So.2d at 675 (citations omitted).
The subsequent cases, Russell v. State, 607 So.2d. 1107 (Miss. 1992), Ladner v. State, 584 So.2d 743 (Miss. 1991); Mackbee v. State, 575 So.2d 16 (Miss. 1990), and Berry v. State, 575 So.2d 1 (Miss. 1990), have all applied the Turner mandate retroactively, reversing and remanding the cases for re-sentencing because the jury sentenced the defendant to death prior to an habitual offender determination by the trial judge.
This Court has totally ignored its opinion in Turner. Prior to Turner, trial judges and prosecutors had relied upon this Court's affirming of cases in which the habitual offender status hearing was held after the sentencing phase of the trial. Griffin v. State, 557 So.2d 542 (Miss. 1990); Mhoon v. State, 464 So.2d 77 (Miss. 1985). The judges, prosecutors, and defense lawyers should be able to rely upon this Court to be consistent in our opinions. Besides, the Turner decision was not compelled by constitutional law. However, with the jury's sentence of death upon *1283 Taylor being imposed five months prior to the Turner decision, under then established precedent, we should follow our directive in Turner and apply that decision prospectively, thus finding that Taylor is not entitled to relief under this issue. This Court has incorrectly granted retrospective relief in subsequent cases to Turner. This practice should cease.
Additionally, the facts of this case remove it out of the realm of Turner. The official transcript reflects that an habitual offender hearing was never conducted in the case sub judice. There was no adjudication of Taylor as an habitual offender. Without an adjudication, Taylor's status as to whether he was an habitual offender is sheer speculation at best. However, to this writer it is clear that Taylor was not an habitual offender due to the trial judge not adjudicating Taylor to be an habitual offender.
I find no merit to the issue raised by Taylor. I would affirm the trial court.

XIII. THE AGGRAVATING CIRCUMSTANCES FOUND BY THE JURY ARE SUPPORTED BY LEGALLY SUFFICIENT EVIDENCE.
The majority maintains there is no evidence to support the giving of three of the aggravating circumstances allowed for the jury to consider. While the majority is correct that the evidence is insufficient on one aggravator, it was sufficient on the remaining two aggravators.

While Engaged in the Commission of Kidnapping or Flight after Committing Kidnapping.
The majority maintains that because the car in which the victim's body was found was not located for some months after her disappearance and because the windows were open when the car was found, it is not possible to say with certainty that the conditions existing in the car were caused by Taylor's actions in holding Mildred against her will. The State argued that Mildred Spires left her home intending to return shortly. There was evidence offered the jury supporting this contention. On September 1, her body was found in her car five miles from her home in an overgrown field by a frightened youth, taking a shortcut home.
Is the majority suggesting that someone else has tampered with Spire's car between her disappearance on July 11 and September 1, when she was found dead in her car? What more does the majority want? An eyewitness maybe? The State seldom has such a luxury. Mildred Spire's body was found in the back seat with half a bra on her body and the other half on the front seat of her vehicle. The ashtray had been jerked out and broken. A stuffed heart pillow had been torn from its usual position on the rear view mirror. Her keys to the vehicle and a gold chain which she wore around her neck were found underneath the back seat cushion of the car.
The majority forgets the important factor of the spray painting of the dash, steering wheel, doors, and door handles, all of which when considered with the oral testimony concerning this factor, suggests an obvious attempt to cover-up fingerprints. Who else but the killer would conveniently first select, then spray paint the most likely areas where fingerprints might be left on the vehicle. Certainly it is reasonable to say that the jury could have inferred from the evidence that Taylor did all these things intending to avoid detection or lawful arrest. There was sufficient evidence given to the jury supporting these two factors.
I suppose the majority is suggesting that this is all the work of vandals or someone else who spray paints only certain strategic spots on this vehicle, rips down the heart pillow, but leaves the car keys and a gold chain hidden under the back seat cushion. All of this being done, mind you, with a dead body in the vehicle. Vandals? Someone else other than the killer? I do not think so, and neither did the jury. It is far more logical to believe that anyone who stumbled across this vehicle hidden in a over grown field, as did 12 year old Michael Evans, would have immediately fled the scene and reported their findings to police. Overall, there was sufficient evidence presented to the jury on these aggravating factors.

*1284 Especially Heinous, Atrocious or Cruel.
There was sufficient evidence to support the finding of this factor by the jury. The State through Dr. Galvez placed evidence before the jury that death by strangulation is "unnecessarily torturous" to the victim. Dr. Galvez stated: "Suffering. Well, strangulation is not a fast way to kill anybody, you see. If you will, it's a slow way to kill somebody."
This Court has stated that this aggravator may only be used when the jury is instructed as to the meaning in a manner which will channel the jury's discretion in sentencing and has required "conscienceless or pitilessness of the crime which is unnecessarily torturous to the victim." Hansen v. State, 592 So.2d 114, 151 (Miss. 1991), cert. denied, 504 U.S. 921, 112 S.Ct. 1970, 118 L.Ed.2d 570 (1992). As Dr. Galvez further stated:
Strangulation, as I mentioned to you, is blocking the air flow, because that is one of the blood flow or nerves function. But to block the air flow is pretty much like when you are drowning or when a child covers his head with a plastic bag, there is no air flow. It is asphyxia by strangulation.
Strangulation is not instant death. Rather, it is a drawn out process clearly reflecting pain and suffering by its victim. Taylor's killing of Spires is "in an objectively measurable way more horrible and more noxious to civic sensibilities than the run of such crimes." Hansen, 592 So.2d at 151-52. There was sufficient evidence for the jury to find this aggravating circumstance.
Additionally, I adopt my prior view of re-weighing and/or application of harmless error analysis in dissent as stated in Hill v. State, 659 So.2d 547 (Miss. 1994), and Wilcher v. State, 635 So.2d 789 (Miss. 1993).
I respectfully concur in part and dissent in part.
JAMES L. ROBERTS, Jr., J., joins this opinion.
NOTES
[1] Despite this challenge to the testimony offered by the State to prove cause of death, (the criminal agency prong of corpus delicti) the defense conceded in closing argument that the death of Mildred Spires occurred by criminal agency. Defense counsel said: "somebody killed Mildred Spires. Mildred Spires didn't commit suicide. Mildred Spires did not die of natural causes. Somebody took the life of this good, fine young woman."
[2] Rule 6.04 of the Uniform Criminal Rules of Circuit Court Practice provides the procedure for proof of prior conviction under the habitual criminal statute. It provides that, although the indictment must allege the prior offense, the indictment shall not be read to the jury. The rule provides that separate trials be held on the principal charge of the indictment and on the charge of the previous convictions. The rule prohibits the mention of previous convictions during the trial on the principal charge, except for impeachment purposes.