LEE, C.J.,
for the Court:
¶ 1. James Earl Polk Jr. was convicted in the Circuit Court of Marion County of murder and sentenced to life in the custody of the Mississippi Department of Corrections and fined $5,000. Polk now appeals, asserting: (1) his right to confrontation was violated when the trial court admitted statements made by his cousin and codefendant, Howard Earl Polk Jr. (Howard), through the testimony of three witnesses; (2) his right to confrontation was violated when the trial court admitted the testimony from a medical examiner who did not perform the autopsy or author the autopsy report; (3) his constitutional and statutory rights to a speedy trial were violated; and (4) cumulative error. Finding no error, we affirm.
FACTS AND PROCEDURAL HISTORY
112. In October 1996, Polk was charged with Kimberly Rowell’s murder, which occurred on August 25, 1993. However, in January 1997, an order was entered withdrawing the charges, and Polk was released from custody.
¶3. On February 23, 2012, Polk was again charged with Rowell’s murder. The indictment also charged Polk’s cousin, Howard. Howard died prior to trial.
¶ 4. On August 26, 2014, Polk filed a motion to dismiss for lack of a speedy trial. In his motion, Polk claimed: “certain witnesses have died, memories have faded, [and] documents and evidence have been lost that would have been exculpatory.” At a hearing on the matter, Polk argued *1160 that he suffered actual prejudice due to a missing crime-scene video and the deaths of James Carney, chief investigator; Dor-man Pritchard, investigator; Russell Liner, investigator; and Howard. However, the trial court denied Polk’s motion to dismiss for lack of specificity as to actual prejudice.
¶ 5. Polk also filed a motion in limine to restrict the testimony of Dr. Mark Le-Vaughn, Mississippi’s chief medical examiner. Dr. Emily Ward was the medical examiner who performed Rowell’s autopsy and authored the autopsy report. However, due to health issues, Dr. Ward was unavailable to testify at trial.[1] At the hearing, the trial court ruled that Dr. Le-Vaughn would be allowed to testify; however, Dr. LeVaughn’s testimony would be limited.
¶ 6. On September 15, 2014, Polk was arraigned, and his trial began. At trial, Polk objected when the court admitted out-of-court statements made by Howard through the testimony of Theresa Dolla-han, Benny Blesett, and Brandy Hilburn. Polk argued that Howard’s statements were testimonial and were used to inculpate Polk. However, the trial court overruled Polk’s objections.
¶ 7. On September 18, 2014, a jury convicted Polk of Rowell’s murder. Subsequently, Polk filed a motion for a judgment notwithstanding the verdict or, in the al-terative, a new trial, which was denied. Polk appeals.
DISCUSSION
I. Howard’s Statements
¶ 8. In his first issue, Polk claims his right to confrontation under the Confrontation Clause of the Sixth Amendment to the United States Constitution was violated when the trial court admitted out-of-court statements made by Howard through the testimony of Dollahan, Bles-ett, and Hilburn. Specifically, Polk claims Howard’s statements were testimonial and were used to inculpate Polk. This Court reviews a Confrontation Clause objection de novo. Beecham v. State, 108 So.3d 402, 404 (¶ 5) (Miss.Ct.App.2011).
¶ 9. The Confrontation Clause guarantees a criminal defendant the right “to be confronted with the witnesses against him.” U.S. Const, amend. VI.; Miss. Const, art. 3, § 26. “In Crawford v. Washington, [541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004),] the United States Supreme Court held that testimonial statements of witnesses absent from trial can be admitted ... only where the declarant is unavailable and the defendant had a prior opportunity to cross-examine.” Smith v. State, 986 So.2d 290, 296 (¶ 20) (Miss.2008). “The Court declined in Crawford to define ‘testimonial’ statements, but noted that the term, at a minimum, [applies to] ‘prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations.’” Id. at 297 (¶ 21) (quoting Crawford, 541 U.S. at 68, 124 S.Ct. 1354).
Although the Crawford court expressly refrained from attempting a comprehensive definition of “testimonial,” it did provide the following analysis:
Not all hearsay implicates the Sixth Amendment’s core concerns. The text of the Confrontation Clause applies to “witnesses” against the accused — in other words, those who “bear testimony.” “Testimony,” in turn, is typically “a solemn declaration *1161 or affirmation made for the purpose of establishing or proving some fact.” An accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not.
Frazier v. State, 907 So.2d 985, 997 (¶ 40) (Miss.Ct.App.2005) (quoting Crawford, 541 U.S. at 51, 124 S.Ct. 1354). The Crawford court further stated:
Various formulations of this core class of “testimonial” statements exist: ex parte in-court testimony or its functional equivalent — that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially, extrajudicial statements contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions, [and] statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.
Crawford, 541 U.S. at 51-52, 124 S.Ct. 1354 (internal citations and quotation marks omitted).
¶ 10. Finally, “Crawford cites Bruton v. United States, 391 U.S. 123, 126, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), for the proposition that the admission of a codefendant’s statement against a defendant without the opportunity to cross-examine the codefen-dant is a violation of the Confrontation Clause.” Smith, 986 So.2d at 297 (¶ 22) (citing Crawford, 541 U.S. at 57, 124 S.Ct. 1354). In Bruton, the codefendant’s confession to authorities directly named Bru-ton as an accomplice. Bruton, 391 U.S. at 124, 88 S.Ct. 1620.
A. Theresa Dollahan
¶ 11. Dollahan, a family friend, testified that Howard and Polk visited her home on the day after Rowell’s murder. During direct examination by the State, Dollahan testified as follows:
Q: Tell me this again, what did [Howard] say his reason for visiting your house was? What was [Howard] trying to do?
A: To show me he could do what he wanted to do and to smart off about killing Kim Rowell.
Q: So [Howard] — did [Howard] say he killed Kim Rowell?
A: Yes, he did. Yes, he did.
# * *
Q: Ms. Dollahan, you stated that [Howard] talked about killing Kim Ro-well. Is that correct?
A: Yes, he said it. Yes.
¶ 12. Howard’s statements to Dollahan bore no resemblance to the core class of testimonial hearsay identified in Crawford. Rather, they were more akin to “casual remark[s] to an acquaintance.” Therefore, we find that the statements were nontesti-monial and did not violate Polk’s Sixth Amendment right. See Corbin v. State, 74 So.3d 333, 338 (¶ 13) (Miss.2011) (finding the Confrontation Clause applies only to statements that are testimonial). Furthermore, we note that Howard’s statements to Dollahan inculpate Howard and not Polk.
¶ 13. We also note that on cross-examination, counsel for Polk asked Dollahan one question:
Q: Ms. Dollahan, [Howard] told you he killed Kim Rowell? •
A: He was saying it out in my front yard to anyone that would listen. He didn’t directly look at me and say, Theresa, I killed Kim [Rowell], he said, I killed the b[* * * *].
*1162 ¶ 14. This question solicits the same information that Polk is now challenging on appeal. Polk’s claim that Dollahan’s testimony violated his right to confrontation is without merit.
B. Benny Blesett
¶ 15. Blesett was incarcerated in the same unit as Howard at the time of Howard’s statements to him, but testified that he had known Howard his entire life. During direct examination by the State, Blesett testified as follows:
Q: Did [Howard] say anything to you about the Kimberly Rowell murder?
A: We talked about it, yeah.
Q: What did he say regarding his actions?
A: That he killed her about some money, or it was money involved. I mean, what the money was — I mean, what it was for, but it was about some money. For some money, owed him some money, or something like that.
Q: Did he say how he killed her? Did he strangle her, did he beat her? Did he say how he killed her?
A: He said he shot her.
Q: What word did he use to say he shot her?
A: Capped the b[* * * *].
[[Image here]]
Q: Now I don’t want you to give any names, but did [Howard] say he did this crime all by himself?
A: No.
Q: Did he say he had somebody else with him?
A: There was somebody with him, yeah.
Q: I don’t want you to give us any names.
¶ 16. Again, Howard’s statements to Blesett bore no resemblance to the core class of testimonial hearsay identified in Crawford. Rather, they were more akin to “casual remarkfe] to an acquaintance.” Therefore, we find the statements were nontestimonial and did not violate Polk’s Sixth Amendment right. See Corbin, 74 So.3d at 338 (¶ 13). Furthermore, although Blesett testified that Howard stated someone else was with him at the time of the crime, this does not directly or necessarily inculpate Polk. Cf. Bruton, 391 U.S. at 126, 88 S.Ct. 1620. Polk’s claim that Blesett’s testimony violated his right to confrontation is without merit.
C. Brandy Hilburn
¶ 17. Hilburn was an acquaintance of Howard’s. During direct examination by the State, Hilburn testified as follows:
A: ... We went out on the front of the liquor store, and [Howard] pulled out a 9-millimeter pistol, and the exact words he said was, [“]That’s what I shot that b[* * * *] with.[”]
Q: And did you know who he was referring to?
A: Yes, he said Kimberly Rowell[.]
¶ 18. Again, Howard’s statements to Hilburn bore no resemblance to the core class of testimonial hearsay identified in Crawford. Rather, they were more akin to “casual remarkfs] to an acquaintance.” Therefore, we find that the statements were nontestimonial and did not violate Polk’s Sixth Amendment right. See Corbin, 74 So.3d at 338 (¶ 13).
¶ 19. Furthermore, we note that prior to the above line of questioning, counsel for Polk stated:
If the Court please, at this point in time, as long as the testimony relates to [Howard], we have no objection. But if it is anything that [Howard] allegedly says concerning our clientf, Polk], then *1163 we certainly interpose an objection, based on Crawford.
¶ 20. The above testimony does not concern Polk and only relates to Howard. In other words, Howard’s statements to Hil-burn inculpate Howard and not Polk. Polk’s claim that Hilburn’s testimony violated his right to confrontation is without merit.
II. Autopsy
¶21. In his second issue, Polk claims his right to confrontation was violated when the trial court admitted Dr. LeVaughn’s testimony because Dr. Le-Vaughn was not the medical examiner who performed Rowell’s autopsy or authored the autopsy report. In support of his argument, Polk relies primarily on Bullcoming v. New Mexico, 564 U.S. 647, 131 S.Ct. 2705, 180 L.Ed.2d 610 (2011).
¶ 22. “In Bullcoming, the State introduced a forensic laboratory report, which certified Bullcoming’s blood alcohol level, through an analyst who was familiar with the lab’s procedures but had not participated in or observed the testing of Bull-coming’s blood.” Hingle v. State, 153 So.3d 659, 662 (¶ 8) (Miss.2014) (citing Bullcoming, 131 S.Ct. at 2712). “The Supreme Court [of the United States] held that the State’s use of a surrogate analyst ‘who did not sign the certification or perform or observe the test’ fell short of satisfying Bullcoming’s right of confrontation.”, Id. (quoting Bullcoming, 131 S.Ct. at 2710).[2]
¶23. “In a separate opinion m Bullcom-ing, Justice Sotomayor wrote about several circumstances to which Bullcoming did not apply, including instances ‘in which an expert witness was asked for his independent opinion about underlying testimonial reports that were not themselves admitted into evidence.’ ” Id. at 664 n. 3 (quoting Bullcoming, 131 S.Ct. at 2722 (Sotomayor, J., concurring in part)). Shortly thereafter, the Supreme Court addressed this in Williams v. Illinois, 567 U.S. 50, 132 S.Ct. 2221, 2228, 183 L.Ed.2d 89 (2012):
We now conclude that this form of expert testimony does not violate the Confrontation Clause because that provision has no application to out-of-court statements that are not offered to prove the truth of the matter asserted. When an expert testifies for the prosecution in a criminal case, the defendant has the opportunity to cross-examine the expert about any statements that are offered for their truth. Out-of-court statements that are related by the expert solely for the purpose of explaining the assumptions on which that opinion rests are not offered for their truth and thus fall outside the scope of the Confrontation Clause.
¶ 24. Here, the autopsy report prepared by Dr. Ward was not admitted into evidence at . Polk’s trial. Rather, Dr. Le-Vaughn merely testified at trial regarding his own independent opinion as chief medical examiner for the State of Mississippi and as an expert in forensic pathology as to the circumstances and cause of Rowell’s death. Dr. LeVaughn’s opinions were based on the autopsy report, the toxicology report, erime-scenesubmission reports, a diagram, and photographs. Dr. LeVaughn was also cross-examined by. Polk’s trial *1164 counsel. All of these facts distinguish this case from those confronted by the Supreme Court in Bullcoming. Polk’s claim that Dr. LeVaughn’s testimony violated Polk’s right to confrontation is without merit.
III. Speedy Trial
¶ 25. In his third issue, Polk claims his constitutional and statutory rights to a speedy trial were violated.
A. Constitutional Right
¶26. “The Sixth Amendment to the United States Constitution provides an accused the right to a ‘speedy and public trial.’ ” Johnson v. State, 68 So.3d 1239, 1241 (¶ 6) (Miss.2011) (citing U.S. Const. amend VI). “In Barker v. Wingo, [407 U.S. 514, 530, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972),] the Supreme Court provided four factors to consider whenever a defendant claims that his constitutional right to a speedy trial has been violated: length of delay, reasons for delay, whether the defendant asserted his right to a speedy trial, and whether the defense suffered any prejudice from the delay.” Id. (citing Jenkins v. State, 947 So.2d 270, 276 (¶ 13) (Miss.2006)).
¶ 27. In the instant case, the trial court did not articulate its findings and views regarding the Barker factors when it denied Polk’s motion to dismiss. In similar cases, this Court has acted de novo in performing the Barker analysis. See Magnusen v. State, 741 So.2d 282, 287 (¶ 10) (Miss.Ct.App.1998). “[Our supreme court] has noted that it would be extremely helpful if the [trial courts], in considering these matters, would provide an articulated statement of their findings of evidentiary fact and the reasons for the decision to grant or deny the motion to dismiss.” DeLoach v. State, 722 So.2d 512, 516 (¶ 15) (Miss.1998) (citation omitted). We will proceed with a de novo standard of review.
¶ 28. The following timeline of events is pertinent to the Barker analysis:
8/25/1993 Murder of Rowell
10/1996 Polk charged with murder
1/1997 Order withdrawing charges and Polk released from custody
2/23/2012 Indictment
5/8/2012 Polk requested that trial be set for 10/2/2012
10/2/2012 [3] Polk requested a continuance until the 1/2013 term
1/9/2013 [4] Polk requested a continuance until 7/15/2013
6/5/2013 Polk filed a motion for change of venue
7/3/2013 Polk requested a continuance until 3/10/2014
7/19/2013 Order granting a change of venue
2/27/2014 Polk filed a motion in limine
3/11/2014 State requested a continuance until 9/15/2014
4/2/2014 Order setting trial for 9/15/2014 and omnibus hearing for 8/29/2014
8/26/2014 Polk filed a motion to dismiss and a motion in limine
8/27/2014 Omnibus hearing
9/15/2014 Arraignment
9/15/2014 Trial began
¶ 29. Polk claims his speedy-trial clock started ticking when he was initially arrested — approximately twenty-one years before his trial. However, “a defendant’s speedy trial right attaches only after the defendant has become an ‘accused.’” United States v. Hutchins, 818 F.2d 322, 326 (5th Cir.1987) (citing United *1165 States v. Marion, 404 U.S. 307, 313, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971)). “[A] person is not an ‘accused’ unless he or she is either formally- charged or else arrested on criminal charges.” Id. (citing Marion, 404 U.S. at 320, 92 S.Ct. 455). The Supreme Court has also noted that “when no indictment is outstanding, only the actual restraint imposed by arrest and holding to answer a criminal charge engage the particular protections of the speedy trial provision of the Sixth Amendment.” Id. (citation omitted).
¶ 30. After reviewing the record, it is clear that after January 1997, no charges were pending against Polk, Polk was not accused under the law, Polk was not under arrest, and there was no evidence that Polk’s movement was restrained in any practical way. See id. Accordingly, we conclude that the speedy-trial clock ceased to run when Polk was released after his initial arrest and did not begin to run anew until the February 23, 2012 indictment. See id. Therefore, our analysis will consider whether Polk was denied his right to a speedy trial from the time he was indicted on February 23, 2012, until his trial commenced on September 15, 2014.
1. Length of Delay
¶ 31. Our supreme court has held that a delay of eight months or more is considered presumptively prejudicial, thereby triggering a full Barker analysis. McBride v. State, 61 So.3d 174, 179 (¶ 12) (Miss.Ct.App.2010). Here, Polk’s trial was held 935 days from the date of his indictment; thus, the delay is presumptively prejudicial, and a Barker balancing test- is required. See id.
2. Reasons for Delay
¶ 32. “Under the second Barker prong, ‘the [Sjtate must prove either that the defendant prompted the delay or that the [Sjtate did, but with good cause.’” Newell v. State, 175 So.3d 1260, 1269 (¶ 11) (Miss.2015) (quoting Ross v. State, 605 So.2d 17, 22 (Miss.1992)). Prior caselaw “requires a subtraction of the amount of delay attributed to the defendant and ‘good cause’ from the total period of delay.” Stark v. State, 911 So.2d 447, 450 (¶ 11) (Miss.2005).
¶33. On May 8, 2012 — seventy-five days after Polk was indicted — Polk requested that trial be set for October 2, 2012. However, on October 2, Polk requested a continuance until the January 2013 term. On January 9, 2013, Polk requested a second continuance until July 15, 2013. And on July 3, 2013, Polk requested a third continuance until March 10, 2014. None of the time from May 8, 2012, until March 10, 2014, can be counted against the State. See Vickery v. State, 535 So.2d 1371, 1375 (Miss.1988) (continuances granted on behalf of the defense are deducted from the total number of days leading to trial).
¶ 34. On March 11, 2014, the State requested its first continuance until September 15, 2014, due to the unavailability of an expert witness. “The United States Supreme Court specifically held in Barker that ‘a valid reason, such as a missing witness, should serve to justify appropriate delay.’ ” Newell, 175 So.3d at 1271 (¶ 18) (quoting Barker, 407 U.S. at 531, 92 S.Ct. 2182); see also Birkley v. State, 750 So.2d 1245, 1250 (¶17) (Miss.1999).
• ¶ 35. Based on the above analysis, the only delay truly attributable to the State is the seventy-five days from Polk’s indictment until his request for a trial date. Because this period is shorter than the presumptively prejudicial period of 270 days, this factor does not weigh in -favor of Polk. See id.
*1166 3. Whether the Defendant Asserted His Right to a Speedy Trial
¶ 36. “As for the third Barker factor, ‘although it is the State’s duty to [e]nsure that the defendant receives a speedy trial, a defendant has some responsibility to assert this right.’ ” Id. (quoting Taylor v. State, 672 So.2d 1246, 1261 (Miss.1996)). “[A] demand for a speedy trial is distinct from a demand for dismissal due to violation of the right to a speedy trial.” McBride, 61 So.3d at 181 (¶ 20) (quoting Brengettcy v. State, 794 So.2d 987, 994 (¶ 17) (Miss.2001)). “A motion for dismissal seeks discharge, not trial.” Id. (citing Perry v. State, 637 So.2d 871, 875 (Miss.1994)).
¶ 37. Polk filed a motion to dismiss. See id. at (¶ 21). However, the record does not reflect that Polk ever filed a motion demanding a speedy trial. See id. We also note that the motion to dismiss was the first time Polk complained about the delay in his trial. See id. Accordingly, with this motion, Polk was not trying to have his case heard but, rather, have it dismissed. See id. Therefore, this factor does not weigh in favor of Polk. See id.
4. Prejudice to the Defendant
¶ 38. As for the fourth Barker factor, “the [appellate court] is to consider prejudice to the defendant, bearing in mind three interests: (1) prevent oppressive pretrial incarceration; (2) minimize anxiety and concern of the accused; and (3) limit the possibility that the defense will be impaired.” Johnson, 68 So.3d at 1244 (¶ 16) (citing Jenkins, 947 So.2d at 277 (¶ 21)). “[S]ince the defendant is clearly in the best position to show prejudice under the ‘prejudice’ prong, the burden remains with [Polk.]” Id. at 1245 (¶16).
¶39. Polk claimed that he suffered actual prejudice due to a missing crime-scene video and the deaths of the chief investigator, two investigators, and Howard. At the motion hearing, the trial court found no actual prejudice. We agree.
¶ 40. “[Our supreme court] in Ross v. State, 605 So.2d 17, 23 (Miss.1992), acknowledged the possibility of prejudice that would be inherent in an extended delay, such as diminished memories, inaccessible witnesses, and lost evidence.” Bailey v. State, 78 So.3d 308, 323 (¶ 56) (Miss.2012). “However, in Ross, [the supreme court] stated that ‘the defendant must prove that this prejudice impaired a fair trial outcome; otherwise, such a claim is speculative.’ ” Id. (emphasis added) (citing Ross, 605 So.2d at 23). Polk was unable to offer any proof that the lost evidence or inaccessible witnesses impaired his ability to mount a defense or impaired a fair-trial outcome. See id. Accordingly, this factor does not weigh in favor of Polk.
¶ 41. Balancing the Barker factors, we cannot reach the conclusion that Polk’s right to a speedy trial was violated. Polk’s claim that his constitutional right to a speedy trial was violated is without merit.
B. Statutory Right
¶ 42. “Our state law provides defendants with a right to a speedy trial under Mississippi Code Annotated section 99-17-1 [ (Rev.2015) ].” Scott v. State, 8 So.3d 855, 863 (¶ 35) (Miss.2008).
¶ 43. The statute reads:
Unless good cause be shown, and a continuance duly granted by the court, all offenses for which indictments are presented to the court shall be tried no later than two hundred seventy (270) *1167 days after the accused has been arraigned.
Miss.Code Ann. § 99-17-1.
¶ 44. “[0]ur speedy trial statute is plain and unambiguous, and it requires that the defendant be tried no later than 270 days after arraignment unless good cause be shown.” Perry v. State, 419 So.2d 194, 198 (Miss.1982). “Thus, under this statute, the time prior to arraignment is not computed to determine compliance with the statute.” Id. (citing Davis v. State, 406 So.2d 795, 798 (Miss.1981)).
¶ 45. In the instant case, Polk was arraigned on September 15, 2014. And Polk’s trial commenced the same day. Polk’s claim that his statutory right to a speedy trial was violated is without merit.
IV. Cumulative Error
¶ 46. In his final issue, Polk claims that the cumulative effect of all the errors committed during trial, even if not reversible in themselves, combine to make up reversible error.
¶ 47. The supreme court “has often ruled that errors in the [trial] court that do not require reversal standing alone may nonetheless[,] taken cumulatively[,] require reversal.” Conley v. State, 790 So.2d 773, 807 (¶ 141) (Miss.2001) (quoting Jenkins v. State, 607 So.2d 1171, 1183 (Miss.1992)). “However, where there was no reversible error in any part, ... there is no reversible error to the whole.” Id. (citation omitted).
¶48. Because we find no error, this issue is without merit.
¶ 49. THE JUDGMENT OF THE MARION COUNTY CIRCUIT COURT OF CONVICTION OF MURDER AND SENTENCE OF LIFE IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AND TO PAY A FINE OF $5,000 AND AN ASSESSMENT OF $10,000 TO THE PUBLIC DEFENDER FUND, IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO MARION COUNTY.
IRVING AND GRIFFIS, P.JJ., BARNES, ISHEE, CARLTON, FAIR AND GREENLEE, JJ., CONCUR. JAMES, J., CONCURS IN PART WITHOUT SEPARATE WRITTEN OPINION. WILSON, J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION.

. In an email, Dr. Ward stated that she was on numerous chemotherapy and immunother-apy medications.

. Applying the rule in Bullcoming, our supreme court has held that “a supervisor, reviewer, or other analyst may testify in place of the primary analyst where that person was actively involved in the production of the report and had intimate knowledge of [the] analyses even though he or she did not perform the tests firsthand.” Hingle, 153 So.3d at 663 (¶ 9). However, this case is distinguishable in that Dr. LeVaughn was not actively involved in the autopsy or the production of the autopsy report.

. Date mailed for signature.

. Date mailed for signature.